IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BENJAMIN A., through his                          :
Parents MICHAEL and KAREN A.,                     :
of Kennett Square, PA                             :
                                                  :       Civil Action
                Plaintiffs                        :
        v.                                        :       No.
                                                  :
UNIONVILLE-CHADDS FORD                            :
SCHOOL DISTRICT                                   :
740 Unionville Rd.                                :
Kennett Square,  PA 19348                         :
                                                  :
                Defendant                         :

## COMPLAINT

### I.    Preliminary Statement

1.     This action is brought by Benjamin A., a minor child with disabilities, and his

Parents Michael and Karen A. (collectively referred to as "Plaintiffs" or the "Family"), against

Defendant Unionville-Chadds Ford Area School District (the "District") under the Individuals

with Disabilities Education Act ("IDEA") 42 U.S.C. § 1400, et seq. and its federal and state

implementing regulations; Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29

U.S.C.A. § 794, and its federal and state implementing regulations; the Americans With

Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, et seq., and its federal and state

implementing regulations; and Chapters 14 and 15 of the Pennsylvania Code.

2.     At all relevant times the District failed to provide Benjamin (sometimes referred

to as "Ben") with an appropriate program and placement, and as such, the family is entitled to

compensatory education for the period of March 13, 2013 through the end of Ben's 2013-2014

school year while Ben attended school in the District, and tuition reimbursement and related

transportation costs for Ben's placement at Hill Top Preparatory School ("Hill Top") for the

2014-2015 and 2015-2016 school years, and until such time as the district develops and offers

Ben an appropriate program and placement.

3.     Despite Ben's history of identified academic, executive functioning, behavioral, and social/emotional needs at school, which are substantiated throughout his educational records, the District's programming consistently failed to meet all of Ben's needs, and was therefore inappropriate.   In contrast to the District's programs, including its most recently proposed program and placement, the program provided through Hill Top provides Ben with the special education supports and services necessary for him to benefit from his education.

4.     Because the District failed in its educational obligations to Ben, the Parents filed an administrative special education due process request alleging that the programming provided to Ben between the 2010-2011 and 2013-2014 school years, as well as the proposed May 13, 2014 and November 10, 2014 Individualized Education Programs ("IEPs") offered by the District were inappropriate, and sought an order that the District provide compensatory education for the 2010-2011 through 2013-2014 school years, and reimburse the Parents for the tuition and transportation costs associated with Ben's placement at Hill Top for the 2014-2015 and 2015-2016 school years, until such time as the District develops and implements and appropriate program and placement for him.  The complaint further requested that the District be ordered to reimburse the Family for a private neuropsychological evaluation obtained in September 2014.

5.     Following a 5-day evidentiary hearing, Due Process Hearing Officer Jake McElligott, Esquire, on February 24, 2016 issued a decision denying relief to the Family.  This Decision is incorrect in major respects, and should be reversed by this Court, and appropriate relief awarded to Ben and the Family.

6.     By finding that the District's IEPs, which contained only accommodations related

to executive functioning and not direct instruction, appropriately met Ben's needs, the Hearing Officer ignored IDEA's stated purpose to prepare students to become independent and self-sufficient, because those IEPs did not provide for direct instruction to Ben in strategies to overcome his executive functioning deficits. Once Ben received that instruction at Hill Top, the evidence shows he became far more self-sufficient in school and at home (e.g., he was more organized, he knew what was for homework, he had the correct materials, etc.) and that the level of support provided to Ben at Hill Top was able to be reduced. Ben was also very successful academically. Indeed, Ben's success at Hill Top would have made it inappropriate to transition him from a successful school back to a public school setting where he failed to make meaningful educational progress.

7. The Hearing Officer also placed undue and legally improper emphasis on Ben's report cards and grades in determining the appropriateness of his the program. IDEA requires more than grades on report cards and advancing from grade to grade each year; by focusing so heavily on grades, the Hearing officer failed to see the overall lack of progress Ben made in developing executive functioning skills, social skills, and reading comprehension.

8. This Court is required to undertake an independent review of the record and the decision of the Hearing Officer. Rowley v. Board of Educ., 458 U.S. 176, 206-07 (1982); Susan N. v. Wilson School Dist., 70 F.3d 751, 759 (3d Cir. 1995). After fully considering the entire record, this Court should reverse the Hearing Officer's decision, and award appropriate relief to the Family for the District's educational failures.

## II. **Parties**

9. Ben was born in 2002, and, at all relevant times to this action, has resided in Kennett Square, Pennsylvania and within the geographical boundaries of the District. Ben is a

student with disabilities as defined under IDEA, and a Protected Handicapped Student under Section 504 and the ADA.

10.    Michael and Karen A. are Ben's Parents.  At all times relevant to this action, they have resided with Ben in Kennett Square, Pennsylvania and within the geographical boundaries of the District.

11.    The District is located at 740 Unionville Road, Kennett Square, Pennsylvania.  The District is the recipient of several sources of federal funds and is an educational agency designated by Pennsylvania law and the Pennsylvania Department of Education for the provision of educational services to individuals residing within its boundaries; such services include those mandated under IDEA as well as Pennsylvania's statutory/regulatory scheme concerning young children with disabilities.  11 P.S. § 875-101; 22 Pa. Code §§ 14.131 - 14.133; see also, e.g., 24 P.S. Chapter 13; and 22 Pa. Code Chapters 14 and 15.

## III.    Jurisdiction and Venue

12.    This Court has original jurisdiction over this appeal pursuant  to 28 U.S.C. § 1331 because this case raises federal questions under the IDEA, Section 504, and the ADA.

13.    Plaintiffs have exhausted their administrative remedies where required under 20 U.S.C. § 1415(i), having timely pursued a Special Education Due Process hearing.

14.    Plaintiffs' claims and remedies are authorized by 20 U.S.C. § 1415, and 28 U.S.C. §§ 2201 and 2202, providing for declaratory and any further relief deemed necessary and proper.

15.    All of the Defendant's actions complained of herein have taken place within the jurisdiction of the United States District Court for the Eastern District of Pennsylvania.  Venue is appropriate in this District pursuant to 28 U.S.C. § 1391.

**IV.** **Additional Facts Supporting Liability**

16.    Ben is currently a thirteen-year-old student who resides with his Parents in the boundaries of the District, and currently attends school at Hill Top, a private licensed academic school. At birth, Ben was diagnosed with a CVA/left thalamic stroke, and shortly thereafter, he was diagnosed with epilepsy. Ben has also since been diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") and Electrical Status Epilepticus of Sleep ("ESES"), which is a form of epilepsy that produces subclinical or unseen seizures during sleep. Ben is currently eligible for special education services under the IDEA as a child with Other Health Impairment ("OHI").

17.    Prior to attending Hill Top at the start of the 2014-2015 school year, Ben attended school in the District from kindergarten through 5th grade, but had previously been receiving special education services previously through the Early Intervention ("EI") system from ages three through five. Unfortunately, the combination of Ben's diagnoses and medical history has resulted in a long history of significant academic, social, emotional and behavioral needs in the school setting. More specifically, despite intellectual abilities solidly in the average range, Ben has significant difficulties with social/emotional and behavioral skills; as well as executive functioning skills, including attention and focus, task initiation and completion, planning, self-regulation, time management, organization, and study skills. These deficits have also impacted Ben's academic skills, particularly in the areas of writing and reading comprehension, and math.

18.    The impact of Ben's disabilities in the school setting was apparent from the time he first transitioned to school-age programming in kindergarten. Although organization and other executive functioning skill demands are fairly limited at the

kindergarten level, the Parents did see social and behavior issues from the outset. While Ben desired to socially engage his peers in play, without proper support and instruction, his attempts at engagement were inappropriate and often resulted in pushing peers away instead of creating lasting friendships. In fact, between kindergarten and 3rd grade, Ben was never invited by another student for a play date or to get together outside of school. Although Ben's efforts at social engagements continued throughout his time in the District, without receiving direct instruction and appropriate supports, he never fared well in the social arena and developed few meaningful relationships with peers, with most of his "friendships" stemming from parental relationships.

19.     The District ultimately determined that Ben would not be promoted to first grade, and instead he was assigned to attend pre-first grade. In fact, the option of pre-first was initially discussed with the Parents during Ben's transition-from-Early Intervention meeting, and was a primary factor in the Parents' decision to transition Ben to kindergarten instead of electing to remain in EI for an additional year. Despite the additional year in pre-first, Ben's academic difficulties and executive functioning weaknesses only grew and became more evident in school as demands increased from grade to grade, and Ben continued to struggle significantly within the school setting. For example, during Ben's 1st grade year, he demonstrated difficulty with comprehending text and making inferences, impacting his ability to read effectively. In 2nd grade, Ben's report card noted that Ben was unable to meet all of the benchmarks in work/study habits, social skills, reading, and writing. In 3rd grade, Ben's difficulties continued to increase, particularly in the areas of work/study habits and social skills. Ben began showing more difficulty completing tasks and remaining focused, as well as difficulty organizing his materials, his desk, and his book

bag to the point where he could not find the materials he needed; he wouldn't know what was needed for homework, and even if he did he either would not bring the correct materials home or would not know how to do the homework.

20.     In April of 2012, Ben was privately evaluated by Children's Hospital of Philadelphia ("CHOP").  The CHOP report noted difficulty in maintaining attention during testing, impulsivity and difficulty in sustaining mental effort.  Ben had clear deficits in social skills, adaptive functioning, and motor speed in his fingers on his right side.  Ben's memory, both spatial and working, was impaired.  The report described a pattern that was consistent with deficits in executive functioning and language formation.  The report also included a variety of reasonable and appropriate recommendations, including executive skills coaching/direct instruction in behavioral self-regulation and metacognition, as well as study skills.  A copy of the CHOP report was provided to the District by the Parents around the same time the Parents received the report.

21.     Ben started his 4th grade, 2012-2013, school year without the supports and services he required to make academic, social/emotional, and behavioral progress.  The IEP in place at the start of the year, dated January 24, 2012, contained three vague behavioral Goals – related to task initiation, task completion and compliance – a written expression Goal and a motor skills Goal. The Specially Designed Instruction ("SDI") included in the IEP contained minimal executive functioning skill supports, and although the related services did include social skills instruction, there were no social skills Goals. Although his IEP was revised in October 2012 – where the Parents were assured that Ben would receive the executive functioning supports and services recommended in the 2012 CHOP report – Ben's program contained the same deficiencies as in previous years.   By January 2013,

Ben's IEP, which was revised yet again, still contained the same deficiencies as his previous IEPs.

22.    Indeed, Ben's special education supports and services actually *decreased* at that time. Ben's January 2013 IEP contained a mere three Goals: behavior/task initiation, reading comprehension, and written expression. Despite some SDIs to address deficits in executive functioning skills, social skills, language skills, and behavior/inattention, the IEP failed to include Goals or any Related Services in these areas. Ben's Goals for both reading comprehension and written expression were vague and unclear, and despite the fact that Ben was removed from the regular education setting at least 7.5 hours per week, Ben continued to struggle in both of these areas.

23.    Although Ben's IEP contained SDIs for cues to assist in executive functioning needs, the District failed to follow through in providing them. Homework books were not being utilized, Ben was seated in the back of the room in multiple classes, and check in/check out procedures were not reinforced. Although a diagnosis of ADHD was reflected in Ben's IEP, Ben was often placed into the hall, unsupervised, as a consequence for not paying attention in class. As a result of the deficiencies in Ben's IEPs and the lack of reinforcement of SDIs, Ben's academic, social/emotional, and behavioral functioning declined. In fact, Ben was required to switch teachers in October of that school year due to the poor progress he was making in his original classroom setting.

24.    In addition to his inadequate school supports, Ben's parents sought behavioral support through Holcomb Behavioral Health System. Ben was evaluated by Holcomb in March of 2013 and was diagnosed with ADHD and Chronic State Encephalopathy with focal seizure disorder.    He received support from Gina Harrison, a behavioral specialist, for

8

target behaviors such as lack of safety awareness and safety noncompliance, impulse control and lack of attention span and noncompliance with adult directives. Despite this evaluation, the District still was unable to identify or refused provide the necessary in school support to help Ben with these behaviors that were clearly affecting his ability to function in the classroom.

25.     Ben began his 5th grade, 2013-2014, school year with the same inappropriate IEP in place. Not surprisingly, Ben managed at the same level of difficulty as in the previous school year, if not worse. Since he was now a 5th grader, increasing demands were now put on good study skills, organizational skills, time management skills, planning and problem solving skills, maintaining attention and social and peer skills. Ben could barely manage with these higher demands and unfortunately, his seizure activity rose in frequency. Ben's parents were now providing private academic tutoring as the District was not providing the support he required in school. His inability to organize was quickly spilling over to his core subjects including writing, reading and math. Ben's teachers did not consistently write assignments down in his homework book and although his parents had advocated in the past for Ben to learn to write the assignments himself, this was not accomplished either. His IEP clearly states that he needs support to ensure that he writes all of his assignments in his book.

26.     Like the previous year, Ben was often sent to the hallway when he was struggling with focusing in class. By the Fall of 2013, he was already near failing with a D average in math. Instead of providing more supports in his present math class, as previous testing had revealed that Ben had displayed high average to superior range skills in math, Ben was switched to a lower math class that already had more supports in place. He also

9

struggled with writing due to his inability to organize a writing piece despite the fact that he had previously scored in the average range for expressive skills.

27.     In March of 2014, at an IEP meeting called by the District, Ben's teacher indicated that he was *not even aware that Ben had executive functioning needs* despite the fact that he had been provided a copy of an evaluation of Ben in the past and Ben's mother had been emailing the teacher regarding these needs. The IEP was then again revised in March of 2014, resulting in an IEP that *finally, for the first time* included some level of direct instruction in executive functioning deficits, however, the IEP *still* failed to include Goals related to all of Ben's executive functioning needs, and the direct instruction in executive functioning skills did not start until sometime in mid-April 2014.

28.     Moreover, no Related Services were added to Ben's IEP despite previously identified deficits in social skills, language skills, and behavior/inattention. The IEP contained Goals in reading comprehension, active listening skills and writing, which were, once again, vague and unclear. Ben's Goal in reading comprehension provided direct, but not research-based, instruction. Despite the fact that he was dropped to a lower class in math, Ben was still not provided a Goal in math. Although he had a Positive Behavioral Support Plan in the past, there were no behavior Goals related to task initiation or task completion, or focus/self-monitoring; and, despite the fact that he clearly struggled all year long, the IEP team did not recommend Extended School Year, or ESY, services.

29.     The IEP team met again on May 13, 2014 in order to discuss Ben's transition from elementary to middle school, and plan for his 2014-2015 school year. For the most part, the May 2014 IEP was no different than the March 2014 IEP, with the exception of a change in the frequency of the direct instruction in executive functioning skills, which

ultimately represented a *decrease* in the total amount of time Ben received such instruction each week. Because it was inadequate to meet Ben's needs, the Parents did not approve the IEP.

30.     After yet another heartbreaking and unsuccessful school year, Ben's parents decided have him comprehensively evaluated by a privately-retained neuropsychologist, Dr. Kara Schmidt.     Dr. Schmidt found that Ben's cognitive, attention, behavioral/social, executive functioning and motor presentation is directly associated with the perinatal stoke and epilepsy.     These weaknesses, especially in the area of executive functioning, she concluded, impact him in all areas including his academic skills, coping skills, and social skills.  In fact, a comparison of standardized achievement testing done by the School District in December of 2012 to the same testing done by Dr. Schmidt in 2014, reveals significant *decreases* in reading comprehension and certain areas of written expression.  Dr. Schmidt also found that Ben suffers from Executive Dysfunction, ADHD and a Specific Learning Disability.  Dr. Schmidt's recommendations included a program with Specially Designed Instruction and academic support, of which she provided in substantial detail.  Dr. Schmidt also highly recommended placement in a small, highly structured educational environment where Ben can receive a high degree of structure, cuing, monitoring, redirection, and positive reinforcement.

31.     Since the District failed to provide an offer of ESY for Ben, the Parents placed him in the five-week summer program at the Centreville Layton School, with the hopes of improving his overall academic functioning and stabilizing some of his behavioral and social deficits.  While at Centreville, Ben flourished. Parents report his overall day to day functioning improved, and Ben enjoyed and benefitted from participating in academic

tasks such as reading.  After seeing the success Ben was capable of achieving while at Centreville combined with the recommendations of Dr. Schmidt, his parents made the difficult decision to remove him from the District and enroll him into Hill Top for Ben's 2014-2015, sixth grade year, and provided the School District with written notice of their decision.

32.     The IEPs that were consistently provided by the District clearly did not support his needs in academics, social skills, life skills, coping skills, organization/study skills or executive functioning.  In contrast, after the initial transition, Ben thrived at Hill Top, not only academically, but behaviorally and emotionally.  His teachers at Hill Top report that Ben "continues to excel," "is attentive and working diligently," "is conscientious," and "eagerly participates in class activities and discussions."  He receives direct instruction in executive functioning, organizations and study skills, support with social skills and coping skills, occupational therapy, one-on-one support, slower paced instruction, preferential seating, scribing assistance as well as many other accommodations – all of which were repeatedly overlooked and omitted by the District's IEPs, despite years of communication by Ben's Parents, struggling classroom experiences, and academic and social difficulties witnessed by District personnel.

33.     The Parents provided the District with a copy of Dr. Schmidt' evaluation on or about October 8, 2014, and the District reconvened the IEP team – presumably to consider the results of Dr. Schmidt's report – on November 10, 2014.  Although the IEP, and particularly the Present Education Levels section, included little if any discussion of Dr. Schmidt's testing results, conclusions, or recommendations, the District did make some changes to the Goals and SDI.  Despite these changes, however, in the end the proposed IEP

represents in many respects the same the programming the District has provided all along, except now the IEP placed Ben in a much larger public middle school environment with far greater demands. Due to its inappropriateness, the Parents ultimately rejected the November 2014 IEP, and filed for due process on or about March 13, 2015.

## V.    **Statutory Authority**

34.    The purpose of the IDEA is to ensure that "all children with disabilities have available to them a free and appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A).  IDEA and the regulations thereunder, 34 C.F.R. § 300.100 et seq., and 22 Pa. Code Chapter 14, require that public school districts provide disabled children with a Free Appropriate Public Education ("FAPE"), as well as extensive due process procedures to effectuate that right

35.    After a child is determined to be eligible, the IDEA statute and regulations provide for periodic re-evaluations, which "may occur not more than once a year unless the parent and public agency agree otherwise; and must occur at least once every 3 years, unless the parent and the public agency agree that an evaluation is unnecessary." 20 U.S.C. §1414(a)(2)(B)(i), (ii); 34 C.F.R. §300.303(b). School districts, however, also have the obligation to "ensure that a reevaluation of each child with a disability is conducted" at any time "the public agency determines that the educational or related services needs, including improved academic achievement and functional performance, of the child warrant a reevaluation; or if the child's parent or teacher requests a reevaluation." 20 U.S.C. §1414(a)(2)(A)(i), (ii); 34 C.F.R. 300.303(a).

36.    Under the IDEA, an "appropriate education" is a series of services described in an

IEP that is reasonably calculated to afford meaningful educational progress in the Least Restrictive Environment ("LRE"). Oberti v. Board of Educ. of Borough of Clementon School Dist., 995 F.2d 1204, 1214-15 (3d Cir. 1993). The fundamental purpose of the IDEA is to ensure that "all children with disabilities have available to them a free and appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400 (d)(1)(A). IDEA and the regulations thereunder, 34 C.F.R.§ 300.100 et seq., require that public school districts provide disabled children with a FAPE, which includes the LRE requirement. 34 C.F.R. §§ 300.17, 300.114-117, 300.320 (various subsections related to LRE).

37. In addition to LRE principles, the IDEA provides that an IEP team, which includes both school officials and the child's parents, must develop an appropriate educational program and placement for each eligible child through an IEP. A two-pronged analysis applies in reviewing a school district's IEP development under the IDEA: (1) whether the District complied with the procedures set forth in the IDEA; and (2) whether the IEP developed through the IDEA's procedures is reasonably calculated to enable the child to receive *meaningful* educational benefit. Board of Educ. v. Rowley, 458 U.S. 176, 206-7 (1982). See also Shore Regional High School Bd. of Educ. v. P.S., 381 F.3d 194, 198 (3d Cir. 2004); Ridgewood Bd. of Educ. v. N.E., 172 F.3d 238, 247 (3d Cir. 1999); Polk v. Central Susquehanna Intermediate Unit 16, 853 F.2d 171, 184 (3d Cir. 1988); Lauren W. v. DeFlaminis, 2005 WL 1353643, at *6 (E.D. Pa. June 1, 2005). The United States Supreme Court in *Rowley* emphasized the importance of adherence to both the substantive *and* procedural requirements of IEP development: "When the elaborate and highly specific procedural safeguards embodied in Section 1415 are contrasted with the general and somewhat imprecise substantive admonitions contained in the Act, we think

that the importance Congress attached to the procedural safeguards cannot be gainsaid." Rowley, 458 U.S. at 206-7. See also Muth v. Central Bucks County School Dist., 839 F.2d 113 (1998) (ordering reimbursement for delayed IEP).

38.     The IEP is the cornerstone of the special education program for a student. Honig v. Doe, 484 U.S. 305, 311 (1988); Ridgewood, 172 F.3d at 247; W.B. v. Matula, 67 F.3d 484, 492 (3d Cir. (1995), abrogated on other grounds, A.W. v. Jersey City Public Schools, 486 F.3d 791 (3rd Cir. 2007); Polk, 853 F.2d at 173.   The IDEA requires that every IEP include a statement of the child's present levels of academic achievement and functional performance; a statement of measurable annual Goals; a description of how the child's progress toward meeting the annual Goals will be measured and when periodic reports on the progress the child is making toward meeting the annual Goals will be made; a statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child, or on behalf of the child; a statement of the program modifications or supports for school personnel that will be provided to enable the child to advance appropriately toward attaining the annual Goals, to be involved in and make progress in the general education curriculum; and an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class and in activities.  20 U.S.C. §1414 (d); 34 C.F.R. § 300.320.

39.     It is the School District's non-delegable obligation to create an appropriate IEP. Shore Regional High School Bd. of Educ. v. P.S., 381 F.3d 194, 199 (3d Cir. 2004), Carlisle Area School Dist. v. Scott P., 62 F.3d 520, 533 (3d Cir. 1995); Furhmann v. East Hanover Bd. of Educ., 993 F.2d 1031, 1035 (3d Cir. 1993).  Even a parent's failure to participate in a meaningful manner in the IEP process will not excuse an inappropriate IEP.   Warren G. v. Cumberland

15

Valley School Dist., 190 F.3d 80 (3d Cir. 1999); Susquenita Sch. Dist. v. Raelee S., 96 F.3d 78

(3d Cir. 1996).

40.     The Supreme Court has determined the IEP to be the "primary vehicle" and the

"centerpiece of the statute's education delivery system for disabled children," and to embody the

substantive standard for school districts' obligation to provide FAPE to children with disabilities.

Honig v. Doe, 484 U.S. 305, 311 (1988).  Therefore, when an eligible child with a disability is

denied an appropriate IEP and the special education and Related Services described and

promised therein, the child is denied FAPE.

41.     The Third Circuit Court of Appeals has also clarified that under the IDEA, a child

with a disability is entitled to a program that is reasonably calculated to confer *meaningful*

educational benefit.  Polk, 853 F.2d at 184; Oberti v. Board of Educ. of Borough of Clementon

School Dist., 995 F.2d 1204, 1213 (3d Cir. 1993); Ridgewood, 172 F.3d at 247.  In order to

provide meaningful benefit, a child's IEP must include academic and functional Goals designed

to meet the child's educational needs that result from the child's disability.   34 C.F.R. §

300.320(a)(2)(i).

42.     It is abundantly well settled that "education" extends beyond discrete academic

skills, and includes the social, emotional, and physical progress necessary to move the child

toward meaningful independence and self-sufficiency consistent with the child's cognitive

potential.  M.C. v. Central Regional School Dist., 81 F.3d 389, 393-394 (3d Cir. 1996);  Polk,

853 F.2d at 181-182; Kruelle v. New Castle County School Dist., 642 F.2d 687, 693 (3d Cir.

1981); Armstrong v. Kline, 629 F.2d 269 (3d Cir. 1980); Bucks County Public Schools v.

Department of Educ., 529 A.2d 1201 (Pa. Cmwlth. 1987); Big Beaver Falls Area Sch. Dist. v.

Jackson, 615 A.2d 910 (Pa. Cmwlth. 1992).  Therefore, for an IEP to be appropriate, it must

offer a child the opportunity to make progress that is "meaningful" in all relevant domains under IDEA, including behavioral, social and emotional. M.C., 81 F.3d at 394; Ridgewood, 172 F.3d at 247. In determining whether the IEP is appropriate, the Court must determine whether the IEP offers "meaningful benefit" and "significant learning" in light of the child's potential and the court may consider post-IEP progress in deciding if FAPE was provided. G. "J." D. v. Wissahickon School Dist., 832 F.Supp.2d 455 (E.D. Pa. 2011).

43.    "If a court determines that the school has offered an inappropriate education for a child, and an aggrieved parent has unilaterally chosen to place her child in an appropriate placement, appropriate relief may be ordered." Christen G. v. Lower Merion Sch. Dist., 919 F. Supp. 793, 798 (E.D. Pa. 1996). The Supreme Court has clearly established that when a school district has not *offered* an eligible child a FAPE, and when the parents obtain and pay for an appropriate private program along with other equitable considerations, the school district must fund the private program provided by the child's parents. School Comm. of Burlington v. Dept. of Educ. of Massachusetts, 471 U.S. 359, 370-371 (1985); Florence County School Dist. Four v. Carter, 510 U.S. 7, 14 (1993); Forest Grove School Dist. v. T.A., 129 S.Ct. 2484, 2489 (2009) (upholding hearing officer's decision that because school district "did not *offer* Respondent a FAPE and his private-school placement was appropriate under IDEA, ... the District [must] reimburse respondent's parents for the cost of the private-school tuition") (emphasis added). See also Christen G., 919 F. Supp. at 815 (to satisfy FAPE obligations, LEA must make formal offer of an appropriate educational placement); Caitlin W. v. Rose Tree Media School Dist., 2009 WL 1383304, at *5 (E.D. Pa. May 15, 2009) ("Plaintiffs are entitled to reimbursement ... if the District offered Caitlin an IEP that was inappropriate."). Tuition reimbursement is a specific statutory remedy available under IDEA. 20 U.S.C. § 1412(a)(1) (parents are entitled to tuition

reimbursement under the IDEA for unilaterally changing their child's placement to a private school if the following three elements are proven: (1) the school district failed to offer the student a FAPE; (2) the private placement is appropriate; and (3) equitable considerations favor reimbursement); 34 C.F.R. § 300.148.

44.     Case law is clear that, where a private school successfully serves a student, such student should *not* be transitioned mid-year from the private school. Norristown Area School Dist. v. F.C., __ Fed. Appx. __ 2016 WL 98571 at *4 (3d Cir. Jan. 8, 2016) (proposal of IEP mid-year did not relieve school district of obligation to fund private school placement for entire school year; "when determining whether a transition from one school to another is proper, the student's welfare must be taken into account.... Here, the court found that transitioning F.C. in mid-April from Stratford Friends to the school district would have been harsh."); see also Christen G. v. Lower Merion School Dist., 919 F. Supp. 793, 817 (E.D. Pa. 1996) (it is inappropriate and detrimental to a child to remove a child mid-year from a successful private school placement).  Educational placement changes must be "viewed with a great degree of caution." Visco v. School Dist. of Pittsburgh, 684 F. Supp. 1310, 1315 (W.D. Pa. 1988). "In balancing the potential benefits against the potential harms, even if the benefits and the harms were to weigh equally, the child in question should not be moved from one program to another." Id. See also Martin K. v. Delaware County Intermediate Unit, 831 F. Supp. 1206, 1227-1228 (E.D. Pa. 1993) (disabled student should not be transferred from one program to another in middle of school year); Block v. District of Columbia, 748 F. Supp. 891, 896 (D.D.C.1990) (upholding hearing officer's determination that, even though school district in middle of school year had remedied deficiencies in prior IEP, mid-year change from private to public school would have been too disruptive for the child).

45.    Pursuant to the above standards, the District unquestionably failed in its responsibilities to Ben and an award of compensatory education and tuition reimbursement is warranted for the school years at issue, and the Hearing Officer erred in concluding to the contrary.

46.    The Hearing Officer erred in finding that the District offered Benjamin a FAPE during his 2013-2014 (from March, 13, 2013) and 2014-2015 school years.

47.    The programs provided by the District during the time period at issue failed to provide Ben with an appropriate program and placement designed to confer either significant learning or meaningful benefit.  As a general matter, the IEPs in question contained inadequate present educational levels, and overall vague, non-measurable and inappropriate Goals failing to address all of Ben's needs or provide a sufficient and objective means of monitoring progress. The IEPs also included inadequate and/or inappropriate Specially Designed Instruction ("SDI"), insufficient Related Services, no meaningful supports for school personnel, and an inappropriate placement.  The IEPs also lacked a Functional Behavior Assessment ("FBA") and assistive technology, or at least an assistive technology evaluation.  More importantly, the IEPs fail to provide Ben with a program that allows him to make meaningful educational progress.

48.    Case law is clear that the mere ability of a student to maintain satisfactory grades does not establish that a District has provided a student with a FAPE, particularly where other significant areas of need, including in the areas of attention, executive functioning, and behavior, are improperly addressed.  See, e.g., Lauren P. v. Wissahickon School Dist., 310 Fed. Appx. 552, 554-55 (3d Cir. 2009) (defendant's "failure to address [the child's] behavioral problems in a systematic and consistent way denied [her] a FAPE."); West Chester Area School Dist. v. Bruce C., 194 F. Supp.2d 417, 421 (E.D. Pa. 2002) (academic progress cannot serve as the sole "litmus

test" for compliance with IDEA) (citing <u>Rowley</u>, 458 U.S. at 203, n. 25) ("We do not hold today that every handicapped child who is advancing from grade to grade in a regular public school system is automatically receiving a 'free appropriate public education.' "); <u>G.D. v. Wissahickon School Dist.</u>, 832 F.Supp.2d 455, 466 (E.D. Pa. 2011) ("the District had an obligation to look beyond simply Jack's cognitive potential or academic progress and to address the attentional issues and behaviors that [student's teacher] had identified as impeding his progress").

49.     In light of the Hearing Officer's over reliance on report card grades, he did not give sufficient consideration to the District's failure to timely and appropriately address Ben's needs in executive functioning, study skills, and social skills. For example, the October 4, 2012 IEP developed following receipt of the CHOP evaluation included no Goals in the area of executive functioning skills, study skills, or social skills. Although the SDI section of the IEP did include some supports and accommodations for executive functioning and homework, the IEP included absolutely no direct instruction in executive functioning or study skills, and to the extent the IEP included social skills instruction in the form of participation in a lunch-bunch group for 20 minutes per week, the instruction was insufficient and not designed to meet Ben's needs.

50.     Despite confirmation through its own reevaluation of Ben's significant executive functioning and social skills needs, the District refused to fully and appropriately address Ben's needs in these skill areas. Not surprisingly, without the needed instruction and supports, Ben continued to struggle significantly throughout 4th grade with initiating and completing tasks, remaining focused, organizing his materials, his desk, and his book bag, and developing and maintaining meaningful relationships.

51.     Ben's 5th grade (2013-2014) year was even worse. Again, Ben spent the

majority of his day in large, overwhelming classes of approximately 23 students, with as many as 4 or 5 other students with IEPs needing assistance from the teacher. Ben also began the year with the same inappropriate program provided during 3rd and 4th grades, so he was again not receiving any direct instruction in executive functioning, study skills, and social skills, and as such no data on of these skills was being collected by any of his teachers. Ben's deficits in these areas, particularly in executive functioning, were impacting him in all areas.

52.     Ben's executive functioning deficits have also had a significant impact on his academic performance over the years. From very early on in his educational career, Ben demonstrated difficulty with comprehending text and making inferences, impacting his ability to read effectively, and he struggled with written expression, particularly with content, focus and organization. As Ben advanced from grade to grade and academic demands increased, so too did his academic struggles, eventually including not only reading comprehension and written expression, but math as well – an area that Ben had generally excelled in previously. In the end, the District seems to have minimized Ben's significant executive functioning deficits and its impact on his academic levels, particularly in the areas of reading comprehension, written expression, and math, as well as his social skills development.

53.     Standardized and criterion referenced academic testing reveals a decline in certain academic areas while in the District. For example, on the Group Reading Assessment and Diagnostic Evaluation (GRADE) administered at the beginning and end of 4th grade, Ben's scores decreased across the board, and in particular his passage and listening comprehension scores went from the solid average range to below average range.

There is also a steady drop over several years on the other standardized testing, with Ben's scores in reading comprehension and written expression significantly decreasing.

54.     As a result of the above, Ben made minimal progress at best in his program, and has been denied FAPE. When a School District fails to provide FAPE, it is well-settled that compensatory education is an available remedy for the student under the IDEA or Section 504. Lester H. v. Gilhool, 916 F.2d 865, 868-69 (3d Cir. 1990); Ridgewood, 172 F.3d at 250 n.11; M.C., 81 F.3d at 397.  Compensatory education is designed to provide eligible students with the benefit of the services they should have received pursuant to a FAPE. Lester H., 916 F.2d at 873 (award of compensatory education merely compensated the student for an inappropriate placement, belatedly allowing student to receive the remainder of his FAPE).  The amount of compensatory education is calculated by finding the period of deprivation of special education services and excluding the time reasonably required for the school district to rectify the problem. M.C., 81 F.3d at 397.  Thus, compensatory education is an in-kind remedy intended to provide educational services denied to a child by a school district's failure to provide a FAPE. Lester H., 916 F.2d at 873.  The Third Circuit has recently found that an appropriate remedy for a failure to provide FAPE is "the establishment of a fund to be spent on the child's education." D.F. v. Collingswood Borough Bd. of Educ., 694 F.3d 488, 498 (3d Cir. 2012).

55.     In the present matter, for the reasons discussed above, the District failed to meet Ben's needs and thereby, deprived Ben of FAPE.  Accordingly, he is entitled to compensatory education for the time period at issue, and the Hearing Officer erred in ruling otherwise.

56.     The Hearing Officer also erred in denying tuition reimbursement for Ben's 2014-2015 (sixth grade) and 2015-2016 (seventh grade) school years.

57.     In determining whether tuition reimbursement should be awarded to a parent, the

courts have created the now well established three-part analysis or test requiring a hearing officer to determine: (1) whether the program and placement offered by the school district at the time the child was enrolled in the private school was appropriate; (2) if not, whether the private school selected by the parents was appropriate; and (3) whether the equities in the case favor reimbursement. <u>Florence County School District Four, et al., Petitioners v. Carter</u>, 510 U.S. 7 (1993); <u>Burlington School Comm. v. Massachusetts Dept. of Educ.</u>, 471 U.S. 359 (1985); <u>Ridgewood Bd. of Educ. v. N.E.</u>, 172 F.3d 238, 248 (3d Cir. 1999); 20 U.S.C. § 1412(a)(1); 34 C.F.R. § 300.148.

58.     Despite significant documentation of Ben's needs, including the results of its own testing, the District continued to offer inappropriate programming for Ben going into the 2014-2015 school year, his 6th grade year.  More specifically, at the time the Parents made the decision to withdraw Ben from the District and enroll him in private school, the program in place for Ben was the May 13, 2014 IEP, which was developed for Ben's 6th grade year at the middle school and included the participation of middle school staff in its development.  Unfortunately, the May 2014 IEP had many of the same deficiencies as did the previous IEPs discussed in detail above.  Although the May 2014 IEP does include some level of direct instruction in executive functioning skills, actual executive functioning Goals beyond the same vague active listening Goal included in the March 2014 IEP are still conspicuously missing, so what specific skills would be addressed during the limited direct instruction sessions included in the May 2014 IEP were unknown.

59.     The correct analysis for determining the appropriateness of the IEP at issue is restricted to the IEP itself rather than predicting what services the District *might* provide.  <u>Susan N. v. Wilson School District</u>, 70 F.3d 751, 762 (3d Cir. 1995) ("The measure and adequacy of an

IEP can only be determined as of the time it is offered to the student, and not at some later date.") (internal quotations omitted); R.E. v. New York City Dep't of Educ., 694 F.3d 167, 187 (2d Cir. 2012) ("The appropriate inquiry is into the nature of the program actually offered in the written plan."). Therefore, Ben's Parents had to decide whether the May 2014 IEP offered Ben an appropriate program based on the IEP *as written* at the time it was offered, not on what additional supports or services not included in the IEP the School District *may* provide. *As written*, Ben's IEPs were plainly inadequate.

60. Most problematic, however, is the District's recommendation for placement in a rather large, and for Ben overwhelming, middle school environment of approximately 1000 students with regular education classes ranging from 24 to 28 students per class. Vitally important to Ben's success in school is the size and structure of the classes and the school itself, both of which need to be small and highly structured. The first and primary recommendations of both independent evaluations – the 2012 CHOP evaluation and the 2014 evaluation by Dr. Kara Schmidt – is for a small, structured classroom and educational environment. Although, presumably in an effort to provide a smaller class size, the District placed Ben in a learning support class for written expression and reading with 6 to 10 students, a learning support classroom is not appropriate for Ben as he is capable of being instructed in the regular education curriculum with appropriate support, including a small, structured environment, and is a violation of Ben's right to be educated in the Least Restrictive Environment. Moreover, a learning support classroom for reading and written expression does not address his need for a small, structured environment overall or in other subject areas. Thus, this proposed placement was clearly inappropriate, and the Hearing Officer erred in not even considering this defect in the District's IEPs.

61.     The District's proposed November 2014 IEP is essentially no different than the
May 2014 IEP, and is therefore also inappropriate.  While the November 2014 IEP *finally*
included a Goal in social skills and some additional SDI, the IEP still did not include any
executive functioning Goals, still required Ben to forego his electives in order to receive direct
executive functioning instruction, still failed to provide the appropriate research-based
instruction in reading, written expression, and math, and still proposed to place Ben in a large
overwhelming middle school environment of approximately 1000 students with regular
education classes ranging from 24 to 28 students.

62.     Moreover, the November 2014 was also inappropriate because it proposed to
move Ben mid-year from his successful program at Hill Top back to a public school
environment and program in which Ben had not been successful.  Case law is clear that, where a
private school successfully serves a student, such student should *not* be transitioned mid-year
from the private school.  Norristown Area School Dist. v. F.C., __ Fed. Appx. __ 2016 WL
98571 at *4 (3d Cir. Jan. 8, 2016); Christen G. v. Lower Merion School Dist., 919 F. Supp. 793,
817 (E.D. Pa. 1996); Visco v. School Dist. of Pittsburgh, 684 F. Supp. 1310, 1315 (W.D. Pa.
1988); Martin K. v. Delaware County Intermediate Unit, 831 F. Supp. 1206, 1227-1228 (E.D.
Pa. 1993); Block v. District of Columbia, 748 F. Supp. 891, 896 (D.D.C.1990). The Hearing
Officer, in finding the November 2014 IEP appropriate, erred in failing to consider: (a) Ben's
success at his program at Hill Top; and (b) that, in light of that success, it would have been
inappropriate to move Ben mid-year from his successful private program.

63.     For all of the reasons discussed above, the Parents established the
inappropriateness of the District's May 2014 and November 2014 IEPs, and therefore met the
first prong of the tuition reimbursement analysis, and the Hearing Officer erred in finding

otherwise.

64.      Because the Hearing Officer found that the District offered the Family an appropriate program for the two school years at issue, he did not decide the remaining two prongs of the tuition reimbursement analysis, namely, the appropriateness of the private school and a consideration of the equities.  However, the Family clearly met its burden on those two prongs of the analysis as well.

65.      The Parents' burden to establish the appropriateness of the private school at issue is not a heavy one, and considerable leeway must be given to the Parents' choice of private school.  More specifically:

> A parent's decision to unilaterally place a child in a private placement is proper if the placement "is appropriate, i.e., it provides significant learning and confers meaningful benefit...." *DeFlaminis*, 480 F.3d at 276 (internal quotation marks and citation omitted). That said, the "parents of a disabled student need not seek out the perfect private placement in order to satisfy IDEA." *Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238, 249 n. 8 (3d Cir.1999). In fact, the Supreme Court has ruled that a private school placement may be proper and confer meaningful benefit despite the private school's failure to provide an IEP or meet state educational standards. *Florence County Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 14-15, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993).

Mary Courtney T. v. School District of Philadelphia, 575 F.3d 235, 242 (3d Cir. 2009).

66.      Under these standards, Hill Top is plainly an appropriate placement for Ben.  Hill Top is a licensed private academic school by the Pennsylvania Department of Education for students of average to above average ability levels with learning disabilities, ADHD, and autism. The school is located on a 25-acre campus, with three main buildings.  Hill Top's total student enrollment is approximately 76 students over grades 5 through 12, with class sizes ranging from 5 to 8 students.  The academic curriculum at Hill Top is aligned with the Pennsylvania state standards.

67.      In contrast to the programming provided by the District, Hill Top provides Ben

with the small, highly personalized and structured, supportive, and individualized program he requires to make meaningful educational progress.  In addition to scheduled direct instruction in executive functioning and social skills, the program at Hill Top also builds-in instruction in these areas throughout its program and throughout the day.  Ben also receives a Personal Education Plan that further individualizes the supports provided to him, and includes a variety accommodations such as check-ins to ensure he is aware of assignments, positive reinforcement, the use of visual aids, the use of checklists to aid in competing tasks, graphic organizers, one-to-one support, chunking of assignments, support for social missteps, sensory breaks, and occupational therapy.  One of the most important aspects of the program at Hill Top for Ben is that the programming and supports noted above are provided within his regular program.  Ben is not being pulled from his classes to go the learning support classroom, or required to miss electives or other school activities to receive direct instruction in executive functioning or social skills; it is all part of the program.  Moreover, rather than using replacement-curriculum designed for student with needs different than Ben, Hill Top provides the kind of research-based instructional techniques that he requires.  As explained by Dr. Schmidt during her testimony and in her evaluation, for Ben to receive an appropriate program it is of critical importance that he be instructed in a small structured classroom and environment, while still receiving grade level curricular instruction, which is exactly what he is receiving at Hill Top.

68.    The best evidence of Hill Top's appropriateness, however, is the progress made by Ben since he began attending that school in September of 2014, as evidenced by the data collection done by Hill Top.  A review of Ben's progress reports/report cards clearly show a student who is consistently progressing academically, and whose need for accommodation decreases while his independence increases.    Most notably, however, Ben's executive

functioning skills, including organization, time management, study skills, etc., have all drastically improved, and he is now beginning to apply learned executive functioning strategies. Ben also made substantial improvements in regard to social and emotional skills. For all of the reasons discussed above, the Parents established the appropriateness of Hill Top, and therefore met the second prong of the reimbursement analysis.

69.     The third prong of the tuition reimbursement analysis requires the Court to consider the equities in this case and determine whether they weigh in favor of reimbursement. As such, a Court may reduce or deny tuition reimbursement in one of three circumstances: (1) where the parents failed to provide the District with written notice of their intent to withdraw their child from the public schools and seek reimbursement for private placement; (2) where the public school expressed its intent to evaluate the student at the time of withdraw (through the issuance of a permission to evaluate) and the parents failed to cooperate in the evaluation; and (3) where the parents acted unreasonably. 34 C.F.R. § 300.148(d).

70.     In the present case, the Parents acted reasonably at all times, and there is no equitable basis to reduce or deny tuition reimbursement. More specifically, the Parents have always been up-front in all their communications and interactions with the District, expressing their concerns about Ben's program when concerns arose. The Parents obtained several independent evaluations of Ben over the years, and always promptly shared those reports with the District. The Parents always provided consent to the District to conduct any evaluation it requested, and attended and fully participated in all IEP meetings. Moreover, prior to Ben's withdraw from the District during the summer of 2014, the Parents provided written notice as required by the IDEA of their intent to withdraw Ben and seek reimbursement, and provided the District with Ben's records from Hill Top when requested. Clearly, the equities weigh in favor

of awarding tuition reimbursement, and the Parents have met the third prong of the tuition reimbursement analysis.

71.     Because the Parents met all of the requirements for obtaining tuition reimbursement, the Hearing Officer erred in denying tuition reimbursement for both years at issue.

72.     Because the District violated IDEA by failing to offer Ben appropriate IEPs, it also violated Section 504, and the Hearing Officer erred in denying relief under Section 504.

73.     Under Section 504, recipients of federal funds such as the District are required to "provide a free appropriate public education [FAPE] to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap." 34 C.F.R. § 104.33(a). The term "appropriate education" is defined as "the provision of regular or special education and related aids and services that (i) are designed to meet individual educational needs of the handicapped persons as adequately as the needs of non-handicapped persons are met and (ii) are based on adherence to the procedures that satisfy the requirements of Section 104.34, 104.35, and 104.36." 34 C.F.R. § 104.33(b).

74.     Section 504 prohibits the exclusion of, or discrimination against, handicapped persons in federally funded programs such as public education. Section 504 and its regulations require the identification of all disabled children and the provision of appropriate educational services. 29 U.S.C.§ 794; 34 C.F.R. § 104.1 et seq. Failure to provide accommodations, supplemental services and FAPE constitutes unlawful discrimination for purposes of Section 504.

75.     Under Section 504, a "handicapped person" is defined as "any person who has a physical or mental impairment which substantially limits one or more major life activities." 34

C.F.R. § 104.3. The term "physical or mental impairment" is defined as "any physical or psychological disorder such as . . . emotional or mental illness and specific learning disabilities" Id. The term "major life activities" is defined as "functions such as caring for one's self . . . learning, and working." Id.

76.     Section 504 provides specific requirements for public school systems to protect all handicapped students, even those who may not qualify under the categorical listings of IDEA. Section 504 requires that "a public elementary or secondary education program shall annually undertake to identify and locate every qualified handicapped person residing in the recipient's jurisdiction who is not receiving a public education and take appropriate steps to notify handicapped persons and their parents or guardians of the recipient's duty under this subpart." 34 C.F.R. § 104.32; Ridgewood, 172 F.3d at 253; W.B. Matula, 67 F.3d 484, 492 (3d Cir 1995), abrogated on other grounds, A.W. v. Jersey City Public Schools, 486 F. 3d 791 (3d Cir. 2007). The District must identify all children who are suspected of having a disability, and must also ensure that its evaluations to determine actual eligibility for services occur within a reasonable time after school officials are notified of a child who is likely to have a disability. Id. at 501.

77.     "When a state fails to provide a disabled child with a free and appropriate education, it violates the IDEA. However, it also violates [Section 504] because it is denying a disabled child a guaranteed education merely because of the child's disability. It is the denial of an education that is guaranteed to all children that forms the basis of the claim." Andrew M. v. Delaware Cty. Office of Mental Health and Mental Retardation, 490 F.3d 337, 350 (3d Cir. 2007).

78.     Thus, the substantive requirements of Section 504 in the education context are largely, but not entirely, equivalent to the requirements under the IDEA. James S. v. School

Dist. of Phila., 559 F. Supp.2d 600, 620 (E.D. Pa. 2008) (citing Molly L. v. Lower Merion School Dist., 194 F. Supp.2d 422, 426 (E.D. Pa. 2002)).  However, However, Section 504 "is broader in scope [than [IDEA].... The definition of 'individual with a disability' under § 504 of the Rehabilitation Act is broader in certain respects than the definition of a 'child with [a] disabilit[y]' under the IDEA." Muller v. Commission on Special Educ. of E. Islip Union Free School Dist., 145 F.3d 95, 100 n.2 (2d Cir.1998).  A school may violate Section 504 independent of any violations of IDEA.  Lauren G. v. West Chester Area School Dist.,906 F.Supp.2d 375 (E.D. Pa. 2012) (granting tuition reimbursement for school district's failure to provide FAPE under Section 504 during period of time for which no relief was granted under IDEA).

79.     Under Section 504, placement procedures require a school to interpret "evaluation data and in making placement decisions, a recipient shall (1) draw upon information from a variety of sources, including aptitude and achievement tests, teacher recommendations, physical condition, social or cultural background, and adaptive behavior, (2) establish procedures to ensure that information obtained from all such sources is documented and carefully considered, (3) ensure that the placement decision is made by a group of persons, including persons knowledgeable about the child, the meaning of the evaluation data, and the placement options, and (4) ensure that the placement decision is made in conformity with 104.34." 34 C.F.R. § 104.35 (c).

80.     In order to establish a violation of Section 504, a plaintiff must prove that: (1) he is "disabled" as defined by the Act; (2) he is "otherwise qualified" to participate in school activities; (3) the school or the board of education receives federal financial assistance; and (4) he was excluded from participation in, denied the benefits of, or subject to discrimination at, the school. Ridgewood,172 F.3d at 253; Andrew M., 490 F.3d at 350.

81.     Ben is a student who, at all times relevant to this Complaint, is and was disabled, and is and was otherwise qualified to participate in, and receive equal benefits from, the Defendant's educational programs with appropriate instruction, accommodations and supplemental supports for purposes of Section 504.

82.     Defendant's failure to offer Ben a non-discriminatory, appropriate educational environment resulted in his being excluded from participation in, denied the benefits of, or subject to discrimination at, his educational program.

83.     Defendant is the recipient of federal financial assistance.

84.     The Hearing Officer erred in not awarding relief under Section 504.   The evidence established that the District violated Section 504 by failing to offer Ben an appropriate program in the years at issue.

85.     Tuition reimbursement is clearly an available remedy under Section 504, as well as under IDEA.   Molly L. v. Lower Merion School Dist., 194 F. Supp. 2d 422, 429 n.7 (E.D. Pa. 2002) ("Tuition reimbursement has been awarded in cases arising under both the Rehabilitation Act and IDEA."); Kevin M. v. Bristol Twp. School Dist., 2002 WL 73233, at *5 (E.D. Pa. Jan. 16, 2002) ("[t]he Court ... finds that plaintiff may pursue his tuition reimbursement claim against Bristol Township pursuant to Section 504 as well as IDEA."); Borough of Palmyra., Bd. Of Educ. v. F.C., 2 F.Supp. 2d 637, 641-42 (D.N.J. 1998) (rejecting argument that tuition reimbursement is not available form of relief under Section 504, and noting that court in Christen G. v. Lower Merion School Dist., 919 F.Supp. 793, 816, 821 (E.D. Pa.1996) held that "reimbursement for costs of private school education was appropriate relief under both the IDEA and Section 504").   An award of compensatory education is also an appropriate form of relief when a school district fails to offer a FAPE in violation of Section 504.   Neena S.v. School Dist.

of Philadelphia, 2008 WL 5273546 at *15 (E.D. Pa. Dec. 19, 2008). Therefore, the Hearing Officer erred in failing to award relief under Section 504.

86. The Hearing Officer also erred in finding that the Family was required to prove that the District acted with "deliberate indifference" to establish a claim of a violation of the right to FAPE under Section 504 with reference to S.H. v. Lower Merion School Dist., 729 F.3d 248 (3d Cir. 2013). S.H. specifically held that a showing of intent (including deliberate indifference) is required only to prove a case for *compensatory damages* under Section 504 and the ADA: "All courts of appeals that have considered this issue have held that *compensatory damages* are not available under § 504 of the RA and § 202 of the ADA absent intentional discrimination." Id. at 262 (emphasis added). A showing of "deliberate indifference" is simply not required where, as here, the Family seeks equitable remedies available under Section 504 and IDEA, including compensatory education and tuition reimbursement, *not* an award of monetary damages. See Ridgewood Board of Education v. N.E., 172 F.3d at 246 (showing of intentional discrimination is not required under Section 504; Patrick B. v. Paradise Protectory and Agr. School, Inc., 2012 WL 3233036 at *7 (M.D. Pa. Aug. 6, 2012) (a showing of intentional discrimination is not required where "to state a denial of a FAPE under Section 504").

87. Because the District violated Section 504, it also violated the ADA. The ADA provides, in relevant part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." The Third Circuit has held that the ADA "extends the nondiscrimination rule of [Section 504] to services provided by any 'public entity' (without regard to whether the entity is a recipient of federal

funds)." <u>Jeremy H. v. Mount Lebanon School Dist.</u> 95 F.3d 272, 279 (3d Cir. 1996). That court held that "the remedies, procedures, and rights" applicable to Section 504 claims are the same as those under the ADA. <u>Id.</u>; <u>see also</u> <u>Tereance D. v. School Dist. of Philadelphia</u>, 548 F. Supp.2d 162, 169-70 (E. D. Pa. 2008) (applying same analysis to claims under ADA as to claims under Section 504); <u>Indiana Area School Dist. v. H.H.</u>, 428 F. Supp.2d 361, 363 n.3 (W. D. Pa. 2006) ("[T]he Third Circuit generally has held that the same analysis under § 504 applies in determining whether a defendant's actions violate the ADA.")

88. Ben is a qualified individual with a disability for purposes of the ADA. As set forth above, the District excluded Ben from participation in, and denied him the benefits of the services, programs or activities of, a public entity. The District's proposed IEPs failed to ensure that Ben was provided with appropriate educational and related services, accommodations and supplemental services which he required in order to have access to the District's programs and services and to make appropriate developmental and educational progress equal to that provided to children without disabilities in violation of the ADA.

89. The Hearing Officer further erred in denying the Family's request for reimbursement for the cost of Dr. Schmidt's IEE, and for her testimony at the hearing. The Parent is entitled to an IEE at public expense pursuant to 34 C.F.R. § 300.502(d), which authorizes the Hearing Officer to order an IEE as part of a hearing on a due process complaint. Here, Dr. Schmidt's report and testimony provided valuable information (which the Hearing Officer did not sufficiently consider) regarding Ben's educational deficits and needs, including the components of an appropriate program and placement for Ben.

90. The IDEA provides that an aggrieved party has the right to bring a civil action in federal district court, which conducts an independent review of the administrative record and any

additional evidence presented by the parties.  Shore Regional High School Bd. of Educ. v. P.S., 381 F.3d 194, 198 (3d Cir. 2004), Susan N. v. Wilson School Dist., 70 F.3d 751, 756-757 (3d Cir. 1995); Delaware County Intermediate Unit v. Martin K., 831 F. Supp. 1206, 1220 (E.D. Pa. 1993). See also 20 U.S.C. § 1415(i)(2); 34 C.F.R. § 300.516(c)(3).

91.    Moreover, Section 504, IDEA, and the ADA all permit recovery of reasonable attorneys' fees by parents who prevail in an action or proceeding thereunder.  42 U.S.C. § 12205; 20 U.S.C. 1415 § 615 (i)(3)(B); 34 C.F.R. § 300.517; 29 U.S.C. § 794a; Andrew M. v. Delaware County Office of Mental Health/Mental Retardation, 2005 WL 783070 at *15 (E.D. Pa. 2005) (attorneys' fees are recoverable under Section 504); Daniel S. v. Scranton School Dist., 230 F.3d 90, 95 (3d Cir. 2000) (attorneys' fees are recoverable under IDEA); Spencer v. Wal-Mart Stores, Inc., 469 F.3d 311 (3d Cir. 2006) (attorneys' fees are recoverable under the ADA).  Section 504 and the ADA additionally permit more expansive costs, including expert witness fees.  L.T. v. Mansfield Twp. School Dist., 2009 WL 248818139 at *2 (D.N.J. Aug. 11, 2009) ("plaintiffs are entitled to reimbursement of their expert fees for their prevailing party status on their Rehabilitation Act claim"); M.M. v. School Dist. of Philadelphia, __ F.Supp.3d __, 2015 WL 6689855 at *12 (E.D. Pa. Nov. 3, 2015) ("Plaintiffs are entitled to recover expert fees under Section 504 and/or the ADA").

92.    Plaintiffs expect to prevail in the present proceeding, thereby entitling Plaintiffs to an award of statutory attorneys' fees.

93.    The IDEA clearly requires an independent review of the administrative decision and permits a court to grant the relief sought by Plaintiffs, since the statute expressly endows courts with broad authority to grant "such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(A); 34 C.F.R. § 300.516(c)(3).  The IDEA further provides that federal

courts hearing such matters "shall hear additional evidence at the request of a party." 20 U.S.C. § 1415(i)(2)(C)(ii).

WHEREFORE,  the Plaintiffs respectfully request that this Court:

1. Assume jurisdiction over this action;

2. Hear additional evidence pursuant to 20 U.S.C. § 1415(i)(2)(C)(ii);

3. Reverse the Hearing Officer's Decision to the extent it fails to Order the District to provide compensatory education and tuition reimbursement as requested;

4. Order the District to pay appropriate compensatory education from March 13, 2013 through the end of Ben's 2013-2014 school year, and tuition reimbursement and related transportation costs for Benjamin's 2014-2015 and 2015-2016 school years at Hill Top Preparatory School;

5. Order the District to reimburse the Parents for the cost of Dr. Kara Schmidt's report and testimony;

6. Order the Defendant to pay Plaintiffs their reasonable attorneys' fees and related costs;

7. Declare the Defendant's actions and omissions to be violative of IDEA, Section 504, ADA; and Pennsylvania law; and

8.   Grant such other relief as this Court deems proper.

Respectfully submitted,

Dennis C. McAndrews, Esquire
ID No. 28012

Michael J.  Connolly, Esquire
ID No.  82065

Michael E. Gehring, Esquire
ID No.  57224

McANDREWS LAW OFFICES
30 Cassatt Avenue
Berwyn, PA
(610) 648-9300 (phone)
(610) 648-0433 (fax)
Attorneys for Plaintiffs