**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **BENJAMIN A., through his parents MICHAEL and KAREN A.,** | **CIVIL ACTION** |
| **v.** | **NO. 16-2545** |
| **UNIONVILLE-CHADDS FORD SCHOOL DISTRICT** | |

<u>**MEMORANDUM RE: CROSS MOTIONS FOR JUDGMENT ON THE**</u>
<u>**ADMINISTRATIVE RECORD**</u>

Baylson, J.                                                                                          August 14, 2017

## I.      INTRODUCTION

This action was commenced by Michael and Karen A. (collectively, "Parent") on behalf

of their son, B.A., against the Unionville-Chadds Ford School District (the "District").  On

March 13, 2015, Parents filed a due process complaint against the District, alleging that it failed

to provide B.A. a free, appropriate public education ("FAPE"), in violation of the Individuals

with Disabilities in Educational Improvement Act ("IDEA").  Parents also bring claims against

the District under Section 504 of the Rehabilitation Act ("Section 504"), and the Americans with

Disabilities Act ("ADA").  Parents seek compensatory education and tuition reimbursement for

that denial, as well as reimbursement for a private neuropsychological report issued in September

2014 that the Parents obtained at their own expense.

After five hearing sessions, the Administrative Hearing Officer Jake McElligott, Esquire

(the "Hearing Officer") concluded that the District had not denied B.A. a FAPE, and B.A. was

not entitled to the relief Parents sought.

Presently before the Court are the parties' cross motions for judgment on the administrative record. Having considered the parties' briefing and the administrative record, we affirm the findings of the Hearing Officer and therefore grant the District's motion, and deny the Parents'.

## II.     FACTS

In order to consider whether B.A. was, as the Parents claim, denied a FAPE, we must consider the evidence within the Administrative Record ("AR"), including the Hearing Officer's Decision and Order, dated February 24, 2016 ("HO Rpt."), the Hearing transcripts (AR, Exs. 5-9), and the various IEPs themselves (AR, Ex. 11, Parents' Exhibits, "P"- 13, 15, 17, 19, 20, 24). As such, it is necessary to set forth the evidence in some detail.

B.A.[1] was born on July 1, 2002, and at the time of the Due Process hearings in mid-2015, B.A. was thirteen years old and in the seventh grade. At all relevant times, B.A. and his Parents have resided within the District, and B.A. has qualified under the IDEA for specially designed instruction/related services as a student with health impairment; specifically, a seizure disorder. (HO Rpt. at 2).

B.A. suffered a stroke in utero that has led to epilepsy and a lifelong seizure disorder. (HO Rpt. ¶ 2). He also has a condition known as electrical status epilepticus of sleep, an epileptic condition resistant to medication management where the person has sub-clinical seizures during sleep. (Id.). B.A. has also been diagnosed with attention deficit disorder ("ADD"). (Id.; see also AR, Ex. 9, Transcript of July 29, 2015 Hearing ("7/29 Tr."), at 145).

---

[1]     The student's initials "B.A.," rather than his name, are used to protect the confidentiality of the student.

B.A. has attended the District since kindergarten and has had an Individualized Education Plan ("IEP") for all school years. (HO Rpt. ¶ 2; see also AR, P-1, 5a, 5b, 7, 8, 10, 13, 15, 17, 19, 20, 24).

In May 2010, near the end of B.A.'s first grade year, the District re-evaluated B.A., and produced the May 2010 re-evaluation report (the "May 2010 RR"). (HO Rpt. ¶¶ 3-5). The May 2010 RR found that B.A.'s academic achievement was commensurate with a full-scale IQ of 115, and so did not identify him with any learning disability. (Id.). Based on the RR, the District determined that B.A. did not require direct speech and language instruction, but identified B.A. as a student with health impairment related to his seizure disorder, and speech language disorder, and recommended modifications and specially designed instruction ("SDIs") to support him with social skills/pragmatic communication, direction, transitions, and gross motor skills. (HO Rpt. ¶¶ 6-8 (citing P-3 at 12-18)). Throughout the 2010-2011 and 2011-2012 school years, B.A.'s IEPs were revised multiple times. (Id. ¶ 9 (citing P-5a, 5b, 7, 8)).

In April 2012, B.A. underwent a neuropsychological evaluation at the Children's Hospital of Philadelphia ("CHOP"). In June 2012, a comprehensive neuropsychological evaluation report (the "2012 CHOP Report") diagnosed B.A. with "Intractable Complex Partial Epilepsy," "Encephalopathy, not otherwise specified" and ADD. (HO Rpt. ¶ 10; P-12 at 5). After sharing the 2012 CHOP report with the District at the outset of the 2011-2012 school year, B.A.'s IEP was revised again. (See P-13 at 1).

Additionally, and in light of the 2012 CHOP Report, in December 2012, the District conducted an additional evaluation of B.A., and promulgated another re-evaluation report (the "December 2012 RR"). (HO ¶ 11; P-14; 7/29 Tr. at 159-167). The December 2012 RR found that B.A. had cognitive/achievement strengths and weaknesses but that overall, B.A. did not

exhibit any deficits that would lead to an identification of any "specific learning disability." (HO Rpt. ¶ 13; P-14 at 22). The December 2012 RR, however, noted that B.A. is "in need of specially designed instruction," and "will need adaptations and accommodations to the curriculum in order to make meaningful progress in the regular education setting." (Id.) The Report recommended, *inter alia*, support in reading comprehension skills, small group direct instruction in writing, as well as various strategies to help with his executive functioning, attention, and organizational difficulties. (HO Rpt. ¶ 17; P-14 at 23).

In January 2013, following the issuance of the December 2012 RR, B.A.'s IEP was revised.[2] (HO Rpt. ¶ 18; P-15). The January 2013 IEP—which was implemented in the second half of the 2012-2013 school year, B.A.'s fourth grade year—contained three "Measurable Annual Goals": (1) behavior/task initiation, (2) reading comprehension, and (3) written expression, each of which indicated a corresponding method of measuring B.A.'s progress and the frequency with which that progress would be tracked. (P-15 at 20-22). The January 2013 IEP also contained a chart of "Modifications and SDIs," which were categorized to address B.A.'s specific needs, including, *inter alia*, his "Writing Needs," "Executive Functioning Needs," "Social Needs," "Reading Comprehension Support," "Language Needs," and "Inattention." (P-15 at 22-27). B.A.'s out of classroom or "pull out instruction" included "physical therapy for two 30-minute sessions a month, social skills instruction one time a week for 20 minutes and written expression for 40 minutes a day." (AR, Ex. 6, Transcript of

---

[2] The January 2013 IEP was the IEP in place in March 2013, and bounds the evidentiary record based on the Parents' complaint in March 2015. (HO Rpt. ¶ 18). As the Hearing Officer explained, and the Third Circuit recently held, the IDEA imposes a filing requirement of two years from the date when a complaining party knew or should have known of the violations which form the basis of the complaint. Here, Parents' filed their due process complaint in March 2015, and the Hearing Officer found the scope of the Parents' claim for remedy would be limited to March 2013. (HO Rpt. at 4; see 7/29 Tr. at 52-57); see G.L. v. Ligonier Valley Sch. Dist. Auth., 802 F.3d 601, 604 (3d Cir. 2015). Parents do not challenge that ruling in the instant appeal.

September 2, 2015 Hearing, "9/2 Tr.," at 396). Under the terms of the January 2013 IEP, B.A.

spent 85% of the day in regular education. (HO Rpt. ¶ 21; P-15 at 32).

Erika Johnson, B.A.'s regular education fourth grade teacher, testified at the Hearing

about how she implemented B.A.'s January 2013 IEP. (See AR, Ex. 7, August 21, 2015 Hearing

Transcript, "8/21 Tr."). For instance, Ms. Johnson testified that she helped B.A. with task

completion by using, *inter alia*, "a timer on his desk," "checklists," "chunk[ing] the task," and

"reward systems." (8/21 Tr. at 356-60) She also worked with him on organizational skills (Id.

at 363 ("I would check his homework planner to make sure he wrote down his homework" and

"helped him organize his desk" to "try[] to teach him how to do it himself")), as well as reading

skills (id. at 368-9 ("I would . . . chunk the test" and ask "basic comprehension questions as he

was reading to make sure he was reading and checking in.")). Ms. Johnson testified that she

believed that B.A. made meaningful educational progress in fourth grade. (Id. at 372-3).

Jennifer Corcoran, B.A.'s fourth grade learning support teacher, also testified about how

she implemented B.A.'s January 2013 IEP, specifically with regard to the SDIs that were

outlined therein. (9/2 Tr. at 395). Ms. Corcoran's classroom was a special education classroom,

and B.A. came to her classroom, in which there were about eight other students, for about forty

minutes per day for writing instruction. (Id. at 396-7). Ms. Corcoran also went into B.A.'s

regular education classroom "daily" to check on him, pursuant to the SDIs, and to provide

"visual support." (Id. at 398). When asked about why there was no "direct instruction listed for

executive functioning skills" in the January 2013 IEP, Ms. Corcoran responded, "[t]he words

direct instruction for executive functioning skills aren't used, but there are—we did incorporate a

lot more SDIs to address his executive functioning needs," in "authentic settings." (Id. at 488-

491). She explained that she did not employ "pull out [executive functioning] direct instruction"

with B.A. because she "thinks it's important to teach executive functioning kind of skills while they're doing it" and in "real life situations." (Id. at 491). Ms. Corcoran also explained how she helped B.A. with organization (id. at 467) and task completion in her class, namely with "redirection or chunking" and "scheduled breaks," as a result of which she noticed improvement. (Id. at 450-454). Ms. Corcoran testified that her goal for B.A. was "to get [him] to do this by himself using the strategies that [she and Ms. Johnson] gave him." (Id. at 472).

Ms. Corcoran also testified generally that B.A.'s "grades supported that he was in the right place" such that he did not need to be in small classes at all times, that he "benefitted from being with his regular education peers," and that she was "pleased with the progress that [B.A.] made in fourth grade[.]" (Id. at 495-6).

David Lichter, B.A.'s fifth grade regular education math teacher for the first quarter of the 2013-2014 school year, also testified as to how he worked with B.A. to implement the January 2013 IEP. (7/29 Tr. at 318). He acknowledged that B.A. had issues with respect to time management, task initiation, and organization, and described his main concern with respect to B.A. as his "inattention." (Id. at 318-320; 334). Mr. Lichter testified that he implemented the SDIs that were to be implemented in regular the education environments, such as instructing B.A. to use a calendar or planner, and to organize his materials so that he could turn in his homework assignments. (Id. at 330-333).

Mr. Lichter also testified about how he asked B.A. to go into the hallway with him "several times," which was a "last" resort to get B.A. to focus, (id. at 338-340; 360). When asked, Mr. Lichter specifically noted that sending B.A. into the hallway was not "a punishment, like going to the corner or something like that[.]" (Id.)

Mr. Lichter testified that he emailed B.A.'s mother to inform her that B.A. would receive a "D" for the first quarter marking period in his math class. (Id. at 342-345). Because B.A. was not thriving in his class, he and Mrs. Williamson determined that he should move into Mrs. Williamson's class after the first quarter, a decision with which Parents agreed. (Id. at 351-2).

In December 2013, B.A.'s IEP team met for its annual consideration of B.A.'s IEP, which led to the implementation of the January 2014 IEP. (HO Rpt. ¶¶ 24; 37; see P-17). The January 2014 IEP contained two "Measureable Annual Goals": (1) Reading Comprehension, and (2) Writing. (P-17 at 17-18). It also contained various "Modifications and SDI[s]," including ones to address "Writing Needs," "Executive Functioning Needs," "Social Needs," "Reading Comprehension," and "language needs" and "inattention." (P-17 at 19-21). It also specified that B.A. would "receive direct instruction in written expression and reading comprehension" in a special education or learning support setting for 45 minutes per day, 5 days per week. His "spelling, math, science, and social studies instruction" would occur in the "regular education setting." (P-17 at 24). Under the terms of the January 2014 IEP, B.A. spent 77% of the day in regular education. (P-17 ay 26; HO Rpt. ¶ 29).

Barbara Williamson, B.A.'s regular education teacher for most subject, except writing and math (for the first quarter of the year), testified about how she implemented B.A.'s January 2014 IEP (AR, Ex. 8, Transcript of July 31, 2015 Hearing, "7/31 Tr." at 146-209). B.A. was in Mrs. Williamson's regular education class (with twenty-three students and one adult aide) for reading, spelling, social studies and science. Mrs. Williamson testified that she implemented the IEP using several strategies regarding task completion and organizational skills, such as teaching B.A. how to make check lists and to write things in his planner. (Id. at 200-201). Mrs. Williamson also testified that she "provide[d] direct instruction with organization with all of

[her] students. [B.A.] in particular would be instructed with the class, but then separately because of the needs that were evident in the IEP." (Id. at 149). She further testified that, "if something we were doing [in class] was not enough, specifically if he needed more monitoring or writing his assignments down, or if he needed more review of concepts being taught, that occurred on a regular basis and changed as the year went on." (Id. at 183; 201). Mrs. Williamson testified that she saw improvement on this dimension throughout B.A.'s fifth grade year. (Id.).

Mrs. Williamson explained that B.A. was switched from Mr. Lichter's math class to her class after the first quarter of fifth grade because "he was not making adequate progress" in Mr. Lichter's class. (Id. at 193). Ms. Williamson's math class—while it had the same curriculum as Mr. Lichter's class—was smaller (with about fourteen or fifteen students), had two or three other supporting adults, and moved at a slower pace. (Id. at 193-4). Ms. Williamson noted that after the change, B.A.'s performance in math improved. (Id.).

Andrew Lefko, B.A.'s fifth grade learning support teacher, also testified about how he helped to implement B.A.'s January 2013 and 2014 IEPs. (See 9/2 Tr. at 515-616). In fact, as Ms. Williamson testified, Mr. Lefko personally went through B.A.'s applicable IEP with each of B.A.'s teachers to ensure that it was being implemented. (7/31 Tr. at 197-8). Mr. Lefko testified that he was aware of all of B.A.'s areas of need, including his "deficits with respect to executive functioning skills," which he considered to be highly related to his issues with organization and "study skills." (Id. at 518-519; 537-8). He testified that while there was no "direct pull-out instruction," there was executive functioning instruction in the classroom. (Id. at 602).

Mr. Lefko testified that because, pursuant to the March 2014 IEP, "learning support for reading" was added, B.A. came to his special education classroom for written instruction for

about 45 minutes per day, in a classroom setting with anywhere from five to eight students.  (Id. at 521-523; 542).  He also went to Mr. Lefko 45 minutes per day for reading comprehension, and was in a small class of students who had a variety of reading related issues.  (Id. at 542).  He noted that while, during that time, they worked "predominately" on reading comprehension, they sometimes also worked on other things.  (Id. at 554).

In February 2014, Mr. Lefko started an "executive functioning group," in which B.A. and two other students met for fifteen minutes per day.  (9/2 Tr. at 551-2).  Mr. Lefko believed that executive functioning "grew as a concern to [B.A.'s mother]," but that it was not the "overriding concern from day one."  (Id. at 558-9).

Mr. Lefko testified that he believed that B.A. benefited from spending the majority of his time in regular classes, and that he benefitted from his time with his regular education peers.  (Id. at 611).  He explained, "[t]here's so much to be gained by being in a classroom of 23, 25 kids from listening to their experiences, to have them listen to your experiences, and to connect[.]"  (Id. at 612).  He indicated that he was pleased with B.A.'s progress during fifth grade.  (Id.).

B.A.'s IEP was again revised in March 2014 (the "March 2014 IEP").  (See P-19).  The key modification in the March 2014 IEP was that B.A. would now have "pull out" time devoted to executive functioning.  Specifically, the revision to the executive functioning "Modification and SDI" stated: "The IEP team has concerns related to [B.A.'s] executive functioning abilities: Executive Functioning Skills Instruction: 30 min. per day/5 days per wk. for instruction in active listening skills, memory strategies, study strategies, reasoning and organization."  (P-19 at 17; HO Rpt. ¶ 31; 7/31 Tr. at 172-4).   Pursuant to this revision, B.A. would spend 69% of his day in a regular education classroom.  (Id. at 24; HO Rpt. ¶ 32).

The District held another IEP meeting on May 13, 2014, the purpose of which was to discuss B.A.'s transition from elementary school to middle school, and promulgate B.A.'s May 2014 IEP. (P-20; HO Rpt. ¶ 33). The SDI related to executive functioning remained the same as stated, as did the percentage of time that B.A. would be in regular education classes. (P-20 at 24, 30). However, in the section explaining the portion of time B.A. would not spend in regular education, the May 2014 IEP stated as follows:

5th Grade:

Reading: 45 min. day/5 days per week
Written Expression: 45 min. day/ 5 days per week
Executive Functioning Skills Instruction: 30 min. per day/ 5 days per week

6th Grade:

Literacy: 45 min. day/ 5 days per week
English: 45 min. day/ 5 days per week
Executive Functioning Skills Instruction: 40 min. per day/ ? days per week

(P-20 at 27). Carol Stern testified that, notwithstanding the "?" in the IEP, it was determined that B.A. would receive 40 minutes of instruction 4 out of 6 days in a school cycle, which would result in either 3 or 4 days of 40-minute instruction per week. (7/31 Tr. at 186-7).

In the summer of 2014, B.A.'s Parents enrolled him in a private school summer program at the Centreville School. (7/29 Tr. at 201; SOF ¶ 9; HO Rpt. ¶ 36). Several teachers, including Ms. Johnson, Ms. Corcoran and Mr. Lefko, testified that B.A. never showed any signs of "regressions" over schools breaks that would have suggested that he needed ESY. (8/21 Tr. at 370-371; 7/31 Tr. at 203; 9/2 Tr. at 610). Significantly, there was testimony in the record that B.A.'s family took vacations at the end of B.A.'s fourth and fifth grade years that caused him to miss the last three weeks of school. (9/2 Tr. at 610-613). While B.A. was given assignments to complete during that time, they were not completed. (Id.).

Also in the summer of 2014, B.A. underwent a private neuropsychological evaluation, at Parents' expense, conducted by Dr. Kara Schmidt (the "Schmidt Report"). (HO Rpt. ¶ 35; P-23 at 22-28; P-31 at 56). The Schmidt Report was thorough and comprehensive, and concluded that while "[B.A.] is performing remarkably well given the nature and severity of his neurological history"—specifically, his "left thalamic stroke and intractable epilepsy"—his weakness "with regard to executive functioning, impact[s] all aspects of his academic day and home life as well as his coping skills and ability to develop typical social relationships with his same age peers." (P-23 at 22). The Schmidt Report incorporates a number of recommendations to accommodate his academic and social needs. For instance:

- B.A. "requires direct specially designed instruction and academic support," but "will benefit from grade appropriate curriculum exposure across all classes; however inclusion and/or co-taught settings should be employed based on his needs";

- B.A. "will do best in a small classroom environment with a low student-to-teacher ratio."

- B.A. should receive "direct instruction" with regard to "organization and execution of multistep projects";

- B.A. should receive "research based instruction" from a "learning support teacher" in the areas of reading and writing;

- B.A. should receive "assistance with social functioning and general social coping skills in a group context.

(P-23 at 22-26). The Schmidt Report also provided a list of "additional accommodations" to help B.A. with his "difficulties with distractibility, impulsivity, attention, working memory and sustained mental effort within the classroom setting." (Id. at 26).

Dr. Schmidt reiterated some of the results of her Report in her testimony, where she explained, "many of the struggles that [B.A.] has with regard to academics in terms of reading comprehension and in terms of his written language are due to his executive function, his

inattention, and the social weaknesses that he has[.]"  Asked how significant, in her opinion, B.A.'s executive functioning deficits were, she said, "I think that he has significant executive functioning deficits, but I think it's [] important to think about it in a broader way, that he has significant disattention and inconsistency in general."  (8/21 Tr. at 247-48).

Dr. Schmidt testified that B.A. would do best in a "small setting" such as Hill Top as opposed to a public school in general (8/21 Tr. at 277-8).  Dr. Schmidt recognized that at Hill Top, "[B.A.] does not have exposure to and does not go to school with regular ed peers[.]"  (Id. at 289).

Dr. Schmidt admitted, on cross examination, that she "did not see [B.A.] when he was a student at [the District]," nor did she specifically recall ever conducting observations at B.A.'s school.  (Id. at 285-6).  Dr. Schmidt further admitted that she "did not know for the program that was proposed for [B.A.] how many students would have been in any of his classes at the middle school."  (Id. at 287; 302).  Dr. Schmidt did not see B.A.'s IEP except in anticipation for her Hearing Testimony, which was after she completed the Schmidt Report.  (Id.).

In August 2014, Parents informed the District that they intended to place B.A. in a unilateral private placement at Hill Top, at public expense.  (HO Rpt. ¶ 37).   B.A.'s mother testified that Parents made the decision to send B.A. to Hill Top based on the Schmidt Report.  (7/29 Tr. at 205).

B.A. was enrolled at Hill Top in September 2014, where he completed both the 2014-2015 and 2015-2016 school years (sixth and seventh grades).  (Id.).  At Hill Top, B.A. did not have an IEP, but rather a so-called personal education plan ("PEP").  (7/29 Tr. at 255).  The PEP did not contain "goals" in the way that his IEP did, but rather included "skills" to be improved upon, which were based largely on the Schmidt Report.  (Id. at 255).

Parents provided Dr. Schmidt's report to the District on October 8, 2014. (7/29 Tr. at 253)

On November 10, 2014, in light of the Schmidt Report, B.A.'s IEP team met to revise the IEP (the "November 2014 IEP") to further expand the support provided to B.A. at the District. (See P-24; 9/2 Tr. at 680-1 ("Q: And as a result of this letter did you determine that the School District should hold an IEP meeting for [B.A.]? A: Yes.")). The District heavily utilized the Schmidt Report in revising B.A.'s November 2014 IEP. (See 7/31 Tr. at 41-48 (Carol Stern discussing in detail the incorporation of the Schmidt Report into the November 2014 IEP)).

A close review of the "Accommodations and SDI" portion of the November 2014 IEP reveals that virtually all of Dr. Schmidt's recommendations were incorporated into this IEP. (SOF ¶ 156; 7/29 Tr. at 46-60). For instance, the November 2014 IEP (1) added a measurable goal of "Listening Skills" (P-24 at 21); (2) placed B.A. in a small classroom environment for reading, written expression, executive functioning and social skill (P-24 at 30); (3) called for in-class support in the areas of both speech/language and math (id.; 7/31 Tr. at 49); and (4) listed a number of classroom accommodations "to address focus and attention." (P-24 at 28). With all of these accommodations, pursuant to the November 2014 IEP, B.A. would still spend 69% of the day in regular education at the District. (P-24 at 36; HO Rpt. ¶ 40).

Carol Stern, a sixth grade learning support teacher at the District who was involved in the drafting of the November 2014 IEP, testified that she "felt extremely positive about [the] [November] IEP meeting" and that B.A. "would really do well at the middle school." (7/31 Tr. at 38). After going through the November 2014 IEP alongside the Schmidt Report, Ms. Stern outlined the ways in which each of the recommendations in the Schmidt Report were

incorporated into the November 2014 IEP, and would have been implemented had B.A. stayed at the District for sixth grade as opposed to transferring to Hill Top. (7/31 Tr. at 10-38; 56-58).

Finally, the Administrative Record reflects that Hill Top provided B.A. with individualized education programming, and that B.A. has made progress while at Hill Top. (HO Rpt. ¶ 47; 7/31 Tr. at 76-142).

## III. PROCEDURAL HISTORY

Parents initiated this matter on March 13, 2015, by filing a special education due process complaint against the District, in which they alleged that the District denied B.A. a FAPE. After five days of evidentiary hearings occurring on July 29, 2015, July 31, 2015, August 21, 2015, September 2, 2015, and November 20, 2015, the Hearing Officer found in favor of the District on all claim. Specifically, the Hearing Officer concluded:

- The District, through its evaluation processes and reports, identified B.A.'s "consistent" needs in the areas of executive functioning, reading/writing, and social skills;

- The District, through the design of B.A.'s programming, proposed IEPs that were reasonably calculated to yield meaningful education benefit; and

- The District, through the implementation of those IEPs, facilitated B.A.'s learning and progress to a significant degree.

(HO Rpt. at 19).

Parents filed the instant complaint on May 24, 2016. (ECF 1). On November 22, 2016, the District filed a motion for judgment on the administrative record (ECF 12, "District Mot."), and accompanying statement of undisputed facts (ECF 13, "SOF"). That same day, Parents filed a cross motion for judgment on the administrative record (ECF 14, "Parent Mot."). On February 3, 2017, Parents filed an opposition to the District's motion (ECF 18, "Parent Opp'n"), to which the District filed a reply brief that same day (ECF 17, "District Reply").

## IV.    LEGAL FRAMEWORK

### A.   IDEA Framework

Under the IDEA, states receiving federal education funding must provide every disabled child with a "free appropriate public education," referred to as a FAPE. 20 U.S.C. § 1412(a)(1).[3] The Supreme Court has described a FAPE as consisting of "educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction."  Bd. of Educ. of Hendrick Hudson Ctrl. Sch. Dist., Westchester Cty. v. Rowley, 458 U.S. 176, 188-89 (1982).  Central to the provision of a FAPE is the IEP, the "program of individualized instruction for each special education student" that is developed via collaboration between parents and schools.  Ridley Sch. Dist. v. M.R., 680 F.3d 260, 269 (3d Cir. 2012).  "Each IEP must include an assessment of the child's current educational performance, must articulate measurable educational goals, and must specify the nature of the special services that the school will provide."  Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49, 53 (2005).

As the Supreme Court recently clarified, "[t]o meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances.  Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1, 137 S. Ct. 988, 999, 197 L. Ed. 2d 335 (2017).  An IEP need not "provide 'the

_____

[3] A FAPE consists of "special education and related services that –
(A) have been provided at public expense, under public supervision and direction, and without charge;

(B) meet the standards of the State educational agency;

(C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and

(D) are provided in conformity with the individualized education program required under section 1414(d) of this title." 20 U.S.C. § 1401(9).

optimal level of services,' or incorporate every program requested by the child's parents" but rather need only, at a minimum, "be reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential." Ridley, 680 F.3d at 269 (quoting D.S. v. Bayonne Bd. of Educ., 602 F.3d 553, 557 (3d Cir. 2010)) (internal quotations omitted).

If parents believe that their child's right to a FAPE has been violated, the IDEA provides recourse in the form of an administrative due process hearing. 20 U.S.C. § 1415(f). Should either party be "aggrieved by the findings and decision" reached after such hearing, the IDEA further allows that party to file a civil suit in state or federal court. Id. § (i)(2)(A).

"The party challenging the administrative decision bears the burden of persuasion before the district court as to each claim challenged." Ridley, 680 F.3d at 270. In evaluating the arguments of the party challenging the Hearing Officer's findings, the district court must base its decision on the preponderance of the evidence. Id. § 1415(i)(2)(C)(iii).

### B. Standard of Review

The Supreme Court has cautioned that the IDEA's provision of judicial review is not an "invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." Rowley, 458 U.S. at 206. To that end, the Court set forth a unique standard of review for district courts to use when reviewing the decisions of Hearing Officers in cases arising under the IDEA: "due weight" must be afforded to such decisions. Id. ("The fact that [20 U.S.C.] § 1415(e) requires that the reviewing court 'receive the records of the [state] administrative proceedings' carries with it the implied requirement that due weight shall be given to these proceedings."). In this Circuit, the "due weight" standard entails a "modified *de novo*" review in which "[f]actual findings from the administrative proceedings are

to be considered prima facie correct," and the court must explain any rejection of them. Shore Reg'l High Sch. Bd. of Educ. v. P.S. ex rel. P.S., 381 F.3d 194, 199 (3d Cir. 2004) (quoting S.H. v. State-Operated Sch. Dist. of City of Newark, 336 F.3d 260, 270 (3d Cir. 2003)).

A district court is to respect the credibility determination of the witnesses made by the administrative hearing officer unless "nontestimonial evidence" requires a contrary conclusion. Shore, 381 F.3d at 200. The district court is therefore to give "requisite deference" when the hearing officer affords more or less weight to the testimony of various experts based upon the nature of their expertise or the amount of time spent with the child. Id.; see also T.M. ex rel. T.M. v. Quakertown Cmty. Sch. Dist., No. 16-3915, 2017 WL 1406581, at *13 (E.D. Pa. Apr. 19, 2017).

The Hearing Officer's legal conclusions are reviewed *de novo*. S.H., 336 F.3d at 270**.**

## V.    DISCUSSION

### A.  Parties' Arguments

#### (1) District's Motion (ECF 12)

The District argues that the Hearing Officer's decision should be upheld because Parents' contentions amount to no more than a "disagree[ment]" with the District as to the best educational setting for B.A., and they are unable to demonstrate that the District failed to provide B.A. with a FAPE. (District Mot. at 1). As for the period between March 2013 and June 2014, for which Parents seek compensatory education, the District argues that the administrative record reflects that B.A. made meaningful progress on executive functioning and other skills in fourth and fifth grades, over the course of which his IEP was repeatedly revised to address his needs. (Id. at 10-13). As for the 2014-2015 and 2015-2016 school years, for which Parents seek tuition reimbursement, the District argues that B.A.'s May 2014 IEP (the operative IEP at the time that

Parents decided to put B.A. in private placement) appropriately addressed B.A.'s needs in a way that also allowed him to receive a meaningful education. (Id. at 19).

The District argues that it should not be penalized for waiting to finalize the November 2014 IEP until after receiving that it from Parents, as the revisions made to it appropriately incorporated all of the recommendations contained in the Schmidt Report. (Id.).

While recognizing that the tuition reimbursement analysis ends if B.A. was provided a FAPE, the District additionally argues, *arguendo*, that (1) Hill Top was not an appropriate placement for B.A., as it's only meaningful accommodation that differs from what was offered by the District is small class sizes (which is not even necessarily beneficial for B.A.); and (2) equitable considerations favor the District because Parents did not provide the District with sufficient notice of their decision to privately place B.A, or an opportunity to correct any perceived deficiencies in his educational programming. (Id. at 21-22).

### (2) Parents' Opposition to District's Motion (ECF 18)

Parents argue in response that the District failed to provide B.A. with a FAPE in two key ways. First, that it failed to provide any systematic, direct instruction in the area of executive functioning until near the end of his fifth grade year, which prevented B.A. from making meaningful progress in that area during that time. (Parent Opp'n at 4-8). Second, the District failed to provide B.A. with the small, structured, regular education environment he required in order to make meaningful educational progress. (Id. at 12- 15). Instead, they argue, B.A. was in classes (of around twenty-three students) that were either "rather large" and "overwhelming," or in classes so small that he was deprived of the benefit of his regular education peers. (Id.).

### (3) Parents' Motion (ECF 14)

In their motion seeking judgment on the administrative record, Parents argue that they are

entitled to compensatory education for the period between March 2013 and June 2014 because:

- While B.A.'s IEPs included certain accommodations for executive functioning, they did not provide for any "direct instruction" in executive functioning or include any specific goals in executive functioning until March 2014. As a result, the District was unable to monitor B.A.'s progress (Parent Mot. at 21-24, 27);

- When B.A. was struggling in fifth grade math class, he was inappropriately disciplined and ultimately switched into a "slower paced, lower level, inappropriate math class" instead of being offered the support he required in his current math class (Parent Mot. at 25);

- The Hearing Officer placed undue reliance on B.A.'s satisfactory grades in determining that the District had provided him with a FAPE.

They further argue that they are entitled to tuition reimbursement for the 2014-2015 and

2015-2016 school years because:

- The May 2014 IEP, which was the IEP in place at the time Parents made the decision to place B.A. in Hill Top, was deficient because it lacked "actual executive functioning goals" and direct instruction in social skills. (Parent Mot. at 25);

- While the May 2014 IEP contained goals for reading comprehension and written expression, they were not implemented in a way that would allow B.A. to make meaningful progress because, *inter alia*, his classes were either too large and "overwhelming" or too small and full of only special education students, which was a violation of the requirement that B.A. be educated in the Least Restrictive Environment ("LRE") (id. at 37);

- The November 2014 IEP—which Parents were not required to consider when deciding whether or not to place B.A. at Hill Top—was also inappropriate because it, *inter alia*, did not include executive functioning goals, required B.A. to forego electives in order to receive an executive functioning instruction, otherwise failed to provide appropriate "research based" reading and writing instruction, and required B.A. to either function in an "overwhelming" regular education environment or non-LRE compliant special education environment. (Id. at 38-40).

Parents also repeatedly argue that the Hearing Officer failed to engage with the details of Parents' complaints regarding the adequacy of B.A.'s IEPs, and that the Hearing Officer's decision was made "in an entirely generic and conclusory fashion." (Parent Mot. at 26).

**B. Analysis**

### i. Did the Hearing Officer err as a matter of law in denying Parents' request for compensatory education between March 2013 and June 2014?

The IDEA grants district courts broad discretion in fashioning a remedy for a denial of a FAPE. See 20 U.S.C. § 1415(i)(2)(C)(iii) (stating that the court "shall grant such relief as the court determines is appropriate"). Determining what relief is warranted is a case by case analysis under which the "court will evaluate the specific type of relief that is appropriate to ensure that a student is fully compensated for a school district's past violations of his or her rights under the IDEA and develop an appropriate equitable award." Ferren C. v. Sch. Dist. of Phila., 612 F.3d 712, 720 (3d Cir. 2010). Compensatory education, or the "replacement of educational services the child should have received in the first place," is one possible remedy available for the deprivation of the right to a FAPE. Ferren C. v. Sch. Dist. of Phila., 595 F. Supp. 2d 566, 577 (E.D. Pa. 2009) (quoting Reid v. Dist. of Columbia, 401 F.3d 516, 518 (D.C. Cir. 2005)); Lester H. v. Gilhool, 916 F.2d 865, 872-73 (3d Cir. 1990).

"'A disabled student's right to compensatory education accrues when the school knows or should know that the student is receiving an inappropriate education.'" Lauren W. v. DeFlaminis, 480 F.3d 259, 272 (3d Cir. 2007) (quoting Ridgewood Bd. Of Educ v. N.E. ex rel. M.E., 172 F.3d 238, 250 (3d Cir. 1999)). The right to compensatory education arises not from the denial of an appropriate IEP, but from the denial of appropriate education. Id. That is, "compensatory education is not an appropriate remedy for a purely procedural violation of the

IDEA." Me. Sch. Admin. Dist., 321 F.3d at 19; see P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist., 585 F.3d 727, 739 (3d Cir. 2009). Where compensatory education is warranted, the student "is entitled to [it] for a period equal to the period of deprivation, excluding the time reasonably required for the school district to rectify the problem." Id.

### 1. Appropriateness of Operative IEPs

### a. Procedural Compliance

Parents' principal argument as to why B.A. was denied a FAPE is that the operative IEPs did not specifically provide for "direct instruction" or contain "Annual Measurable Goals" in the area of executive functioning. They argue that, in light of the 2010 CHOP Report, the District should have known that B.A. required that kind of instruction in order to receive a FAPE. (Parent Opp'n at 9). Parents belittle any instruction the District *did* provide in the area of executive functioning, calling it "*ad hoc* and unsystematic," and amounting to no more than "basic accommodations" that were not measurable because they were not specifically designated as goals in the IEP. (Parent Opp'n at 4; Parent Mot. at 22-26).

As stated above, Parents are only entitled to compensatory education if this Court finds that B.A. was denied a FAPE during the alleged time period. A violation of one of the IDEA's procedural safeguards, such as an inappropriate IEP, is only a denial of a FAPE "if such violation caused substantive harm to the child or his parents." Alloway Twp. Bd. Of Educ. V. C.Q., No. 12-6812, 2014 WL 1050754, at *5 (D.N.J. Mar 14, 2014) (citing C.H. v. Cape Henlopen Sch. Dist., 606 F.3d 59, 66 (3d Cir. 2010)). Substantive harm, in turn, occurs only if the procedural violation "results in a loss of educational opportunity for the student, seriously deprives parents of their participation rights, or causes a deprivation of educational benefits." D.S. v. Bayonne Bd. of Educ., 602 F.3d 553, 565 (3d Cir. 2010).

Here, as the Administrative Record reflects, B.A. received a FAPE between March 2013 and June 2014 because he received substantial instruction in the area of executive functioning throughout his fourth and fifth grade years. The fact that this instruction was not specifically referred to as an "Annual Measurable Goal" or "direct instruction" in the IEPs was neither a procedural nor substantive violation of the IDEA.

Preliminarily, it is worth noting that executive functioning is a particularly broad category of need. One witness, a behavioral specialist, for instance, defined executive functioning as:

> [A] higher level of thinking. It's the ability to self-regulate. It is the ability to have time management and to read social cues and to navigate tasks; the ability to switch tasks; the ability to have forward thinking of things one might need ahead of time; social cues, form relationships, organization.

(7/29 Tr. at 146). Similarly, as Ms. Williamson testified, the term "executive functioning" is a broad one, and encompasses many other important skills—organization, time management, planning, task initiation, study skills—many of which were, in fact, directly addressed in the "Annual Measurable Goals" portion of the IEPs. (see 9/2 Tr. at 437-38; 9/2 Tr. at 419-20). Parents themselves admit that executive functioning is a "global" category, and "includes organizational skills, attention and focus, planning, listening skills, memory strategies, and time management." (Parent Opp'n at 5 n.3).

Therefore, it is entirely reasonable for the District to address, in B.A.'s IEP, its concerns related to his executive functioning skills in other, more specific categories of the IEP. See Parker C. through Todd v. W. Chester Area Sch. Dist., No. CV 16-4836, 2017 WL 2888573, at *9 (E.D. Pa. July 6, 2017) (recognizing that "[e]xecutive functioning is an expansive concept, involving cognitive functions that control and direct all behavior" and holding that district was

"not required to employ direct instruction to address [the student's] executive [functioning]

needs" where those needs were addressed in other aspects of the IEP.).  Examples of this type of

overlap abound in the Administrative Record.  For instance, the December 2012 IEP included a

goal related to task initiation and addressing B.A.'s "avoidance behavior," (P-15 at 21), and the

December 2013 IEP's goals for writing and reading comprehension were intended in part to

address B.A.'s issues with organizing his thoughts and executing his assignments.  (P-17 at 19-

22).

Similarly, the Administrative Record reflects that one reason the IEP may not have

included "direct instruction" for executive functioning skills was because "direct instruction"

tends to refer to individualized, out-of-classroom instruction (9/2 Tr. at 489), but executive

functioning skills are preferably taught in the classroom, "while they're doing it."  (9/2 Tr. at

491).  As Ms. Corcoran testified, "I teach my students how to use executive functioning skills,

like, in authentic settings. . . It's not a pull-out direct instruction, but it's, like, teaching as in real

life situations."  (9/2 Tr. at 490-91).

Moreover, B.A.'s IEP was frequently revised to include support in the area of executive

functioning.  While Parents argue that these frequent IEP revisions indicate that former iterations

of the IEP were not appropriate (see Parent Opp'n at 8), the revisions only support the Hearing

Officer's conclusion that "when the District was confronted with new information, and/or saw

needs developing in school, and/or worked on [P]arents' concerns for [B.A.'s] programming or

progress, it revised [his] IEPs or adjusted [his] programming."  (HO Rpt. at 20).

Indeed, the District's IEP team was required to review B.A.'s IEP at least annually to

determine whether he had reached his stated goals, and to address "lack of progress, necessary

changes arising from reevaluation of the child, and parental input, among other things."  S.H.,

336 F.3d at 265 (citing 20 U.S.C. § 1414(d)(1)(A)(4)). Far from proving the *in*appropriateness of the former iterations, the District's revisions demonstrate its diligent compliance with the provisions of the IDEA. See <u>H.D. ex rel. A.S. v. Cent. Bucks Sch. Dist.</u>, 902 F. Supp. 2d 614, 624–25 (E.D. Pa. 2012) (finding that the administrative record "amply confirms" that the student was offered a FAPE because, *inter alia*, "revisions to his IEP were made to reflect the observations and data showing which interventions were and were not succeeding, with unsuccessful interventions and supports removed and successful ones retained.").

Periodic IEP revisions were particularly appropriate in B.A.'s case because (1) as the Record reflects, all fourth and fifth grade children need some instruction in the area of executive functioning (<u>see</u> 9/2 Tr. at 473; 491), and B.A.'s more pronounced needs become apparent over the course of those critical school years; and (2) B.A.'s epilepsy and ADHD medications were changing throughout his fourth and fifth grade years, and B.A.'s parents admit that these medications could have affected his academic and social progress. (7/29 Tr. at 246).

Accordingly, because of both the nature of B.A.'s observed weaknesses and the District's appropriate effort to address them, the Court agrees with the Hearing Officer that there was no procedural violation of the IDEA.

### b. Substantive Compliance

All of the foregoing supports the conclusion that B.A.'s operative IEPs during the time between March 2013 and June 2014, as written, were sufficient to provide B.A. a FAPE. However, even assuming, *arguendo*, the District's failure to include executive functioning as an "Annual Measurable Goal" or area requiring "direct instruction" did amount to a procedural violation of the IDEA, that omission did not amount to a denial of a FAPE, such that Parents would be entitled to compensatory education. See, <u>e.g.</u>, <u>Rodrigues v. Fort Lee Bd. of Educ.</u>, 458

Fed. App'x 124, 127 (3d Cir. 2011) (not precedential) (finding that a lack of measurable goals in an IEP was a procedural error but did not affect a student's substantive rights or deny a FAPE where student was mainstreamed and progress was measured by grades and state proficiency assessments); <u>N.M. ex rel. M.M. v. Sch. Dist. of Philadelphia</u>, 394 Fed. App'x 920, 923 (3d Cir. 2010) (not precedential) (finding that IEP lacking annual goals relating to some of a student's needs stemming from his disability was not a procedural flaw rising to a substantive harm because the IEP still provided a FAPE). This conclusion is consistent with the IDEA's policy of limiting parents' ability to pursue claims based on procedural violations because the compliance of school districts with the IDEA's procedural requirements, "rather than being a goal in itself," is "primarily . . . significant because of the requirements' impact on students' and parents' substantive rights." <u>D.S.</u>, 602 F.3d at 565.

In its Reply, the District relies heavily on <u>L.M., ex rel. M.M. v. Downingtown Area Sch. Dist.</u>, No. 12-CV-5547, 2015 WL 1725091, at *1 (E.D. Pa. Apr. 15, 2015), to support its contention that "a lack of goals (or "direct instruction") in executive functioning skills [does not] lead[] to a denial of FAPE." (District Reply at 3-5). In <u>L.M.</u>, the court explained,

> it would [] be inconsistent with the longstanding interpretation of the IDEA to find that providing a FAPE requires designing specific monitoring goals for every single recognized need of a disabled student. . . [A] FAPE is a threshold guarantee of services that provide a meaningful educational benefit, not a perfect education. While a lack of goals or progress monitoring for particular areas of need may render an IEP procedurally defective, plaintiffs have not provided evidence that any procedural defects rose to the level of substantial harm necessary to award the compensatory education or tuition reimbursement sought.

<u>Id.</u> (quoting <u>Coleman v. Pottstown Sch. Dist.</u>, 983 F. Supp. 2d 543, 572-3, <u>aff'd in part,</u> 581 F. App'x 141 (3d Cir. 2014). In <u>L.M.</u>, the parents had not made that showing simply because the student's IEP did not contain goals in the area of "written expression." <u>Id.</u>

The Court also finds L.M. persuasive. Here, the Administrative Record is replete with examples of how B.A. was provided with daily personal attention and assistance commensurate with his needs in the area of executive functioning, notwithstanding any lack of specific goals in his IEPs. (See, e.g., 7/31 Tr. at 198-99 (**Q**: When [B.A.] was in your class, how did he do with task completion? **A**: Unsupported, not well. But with support he was able to complete tasks. . . **Q**: Over the years did you see improvement with that with [B.A.]? **A**: Yes.''); 9/2 Tr. at 397-8 ("**Q**: Did you [Ms. Corcoran] provide any push-in services for [B.A.] in his regular education classes? **A**: I'm always around in the classrooms, like going into social studies, science, checking in on them throughout the day . . . you know, by the IEP I wasn't mandated to be in the room . . . [b]ut I just naturally am'').

Accordingly, we agree with the Hearing Officer that "the record taken as a whole shows that [B.A.] made progress in [his] areas of need, as well as academically overall[, and] the District met its obligations to the student under the [IDEA]." (HO Rpt. at 20-21). B.A. received instruction and attention in all aspects of his education—and in the area of executive functioning in particular—such that he was afforded "a meaningful educational benefit," which is all the IDEA protects. D.S., 602 F.3d at 557 ("Though the IEP must provide the student with a basic floor of opportunity, it need not necessarily provide the optimal level of services that parents might desire for their child.") (internal citations omitted).

### 2. Class Size

Parents' other main argument as to how the District denied B.A. a FAPE between March 2013 and June 2014 is that the District consistently placed B.A. in classes that were the wrong size. That is, Parents argue that B.A. was *both* improperly placed in large classes (of about twenty-four students) because they were "overwhelming," *and* improperly placed in smaller,

learning support classes because that denied him of his right to be educated in the Least

Restrictive Environment ("LRE"), pursuant to the "mainstreaming" requirements of the IDEA.[4]

Parents argue that the only way to have appropriately accommodated for B.A.'s needs at the

District would have been to place him in small, but regular education classes. (Parent Opp'n at

13).

As to the class size being too large to provide B.A. a FAPE, the District is correct that

there is virtually no evidence in the Administrative Record to suggest that B.A. was

overwhelmed by the size of his regular education classes. To the contrary, there is evidence in

the record that B.A. benefitted from being in large classes, where he was exposed to and

connected with his regular education peers. (See 9/2 Tr. at 611-12).

Next, while the Hearing Officer did not explicitly analyze the District's compliance with

IDEA's mainstreaming requirement—which Parents did not raise—he evidently did not find any

violation in that regard because the Hearing Officer concluded that B.A. was not denied a FAPE,

and noted the precise percentages of the school day he spent in regular education classes

pursuant to each operative IEP. (See HO Rpt. at ¶¶ 29, 32, 42).

For the sake of completeness, the Court will apply the Third Circuit's two-part test for

determining whether a school is in compliance with the IDEA's mainstreaming requirement,

articulated in Oberti v. Board of Education of Borough of Clementon School District, 995 F.2d

---

[4]        The "mainstreaming" provision of the IDEA provides, in pertinent part,
                "[t]o the maximum extent appropriate, children with disabilities,
                including children in public or private institutions or other care facilities,
                are educated with children who are not disabled, and special classes,
                separate schooling, or other removal of children with disabilities from
                the regular educational environment occurs only when the nature or
                severity of the disability of a child is such that education in regular
                classes with the use of supplementary aids and services cannot be
                achieved satisfactorily.
20 U.S.C.A. § 1412(a)(5)(A).

1204 (3d Cir. 1992). First, the Court must ascertain "whether education in the regular classroom, with the use of supplementary aids and services, can be achieved satisfactorily." Id. (quoting Daniel R.R. v. State Bd. of Educ., 874 F.2d 1036, 1048 (5th Cir. 1989)) (internal quotations omitted). Second, if the Court finds that for the child to benefit educationally he must be placed outside the regular classroom, "the court must decide 'whether the school has mainstreamed the child to the maximum extent appropriate.'" Id. (quoting Daniel R.R., 874 F.2d at 1048). Various factors inform the court's decision under the first prong, including (1) the extent to which the school endeavored to accommodate the child in a regular classroom, including with supplemental aids and services, (2) a comparison of the likely educational benefits to the child from the regular program as opposed to those from a special education program, and (3) the possible detriment to other students of the child's inclusion in a regular classroom. See id. at 1216-1217. Where a school district "has given no serious consideration to including the child in a regular class with such supplementary aids and services and to modifying the regular curriculum to accommodate the child, then it has most likely violated the Act's mainstreaming directive." Id. at 1216.

As to the first Oberti factor, the record is clear that the District seriously considered and took steps to include B.A. in a regular classroom. For one, as Mr. Lefko testified, the District was aware of the ways in which B.A. benefitted from his regular education classes, and sought to keep him in regular education classes for as much of the day as possible. (9/2 Tr. at 611-12). As discussed in detail *supra*, II, the District devoted a lot of resources to providing B.A. with supplemental aids and services in his regular education classes by way of personal in-classroom attention and instruction.

One apt example of the District recognizing B.A.'s weaknesses, yet still making every effort to mainstream him, was its decision to switch B.A.'s fifth-grade math class from a large class, where he was not excelling, to a smaller and slower-moving class, while still keeping him in a regular education classroom that offered the same curriculum.  (7/31 Tr. at 193; HO Rpt. at 20).

Ultimately, the District concluded that B.A. could not benefit from being educated entirely in a general education environment, even with supplementary aides and services. However, the District also satisfied the second prong of the Oberti test, in that it took steps to mainstream B.A. as much as possible, and narrowly tailored the time B.A. spent in learning support classrooms to the areas of concern—namely writing and reading—identified in his IEPs. (See P-20 at 27).  As a result, B.A. spent more than 2/3 of his day in regular education classes at all relevant times.  See H.G. ex rel. Davis v. Upper Dublin Sch. Dist., No. CIV. A. 13-1976, 2015 WL 1808538, at *16 (E.D. Pa. Apr. 17, 2015) (applying Oberti, and finding that the hearing officers "properly concluded that [the student] cannot benefit from being educated entirely in a general education environment," and an IEP in which the student spent 56% of the school day in regular classroom satisfied the requirement that the student be "mainstreamed . . . to the maximum extent possible.").

For all of the foregoing reasons, we find that the Hearing Officer properly found that B.A. was not denied a FAPE for the period between March 2013 and June 2014, and Parents are not entitled to compensatory education for that period.

### ii. Did the Hearing Officer err as a matter of law in denying Parents' request for tuition reimbursement for the 2014-2015 and 2015-2016 school years?

Parents additionally seek tuition reimbursement for the 2014-2015 and 2015-2016 school years during which they placed B.A. at Hill Top.

IDEA empowers a court "to order school authorities to reimburse parents for their expenditures on private special education for a child if the court ultimately determines that such placement, rather than a proposed IEP, is proper under the Act." Sch. Comm. Of the Town of Burlington v. Dep't of Educ., 471 U.S. 359, 369 (1985). Courts apply a three-step analysis to determine whether tuition reimbursement is appropriate, known as the Burlington-Carter test. Under the test, the party seeking relief must show: (1) the public school did not provide a FAPE; (2) placement in a private school was proper; and (3) the equities weigh in favor of reimbursement. See Florence Cnty. Sch. Dist. v. Carter ex rel. Carter, 510 U.S. 7, 12-16 (1993); Burlington, 471 U.S. at 369-70, 373-74.

### 1. Provision of a FAPE

Pursuant to the IDEA, "a school district provides a FAPE by designing and implementing an [IEP], which 'must be reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential.'" P.P. ex rel. Michael P. v. West Chester Area School Dist., 585 F.3d 727, 729-30 (quoting Shore Reg'l High Sch. Bd. Of Educ. V. P.S., 381 F.3d 194, 198 (3d Cir. 2004)). Here, as the Hearing Officer correctly found, "the programming which controlled the student's education when the student was unilaterally enrolled by parents in August 2014 was the IEP of May 2014," because it was "the last-offered IEP which parents had in hand before they made their private placement enrollment decisions[.]" (HO Rpt. at 21-22); see Coleman, 983 F. Supp. 2d 543, 563 ("evaluation of the adequacy of an

IEP can only be determined 'as of the time it was offered to the student, and not at some later date.'"  (quoting Fuhrmann v. East Hannover Bd. Of Educ., 993 F.2d 1031, 1040 (3d Cir. 1993) (internal citations omitted)).  Accordingly, the relevant question is whether the May 2014 IEP was developed and implemented in a way that provided B.A. with a FAPE.

### a.   Appropriateness of the May 2014 IEP

Parents argue that "although the May 2014 IEP finally, and very belatedly, included some direct instruction in executive functioning skills," the May 2014 IEP was still inappropriate because (1) "actual executive functioning Goals . . . were still conspicuously missing[,]" (2) the amount of daily instruction B.A. received in executive functioning decreased, and (3) B.A.'s reading comprehension and written expression goals were not implemented in a way that allowed B.A. to make meaningful progress because it "does not include the kind of research-based instruction in reading comprehension or written expression recommended in [the Schmidt Report]."  (Parent Opp'n at 35-36).

The Administrative Record reflects that the May 2014 IEP was very similar to the March 2014 IEP, in that the "Measureable Annual Goals" included (1) reading comprehension; (2) self-monitoring his active listening; and (3) writing.  Also like the March 2014 IEP, the May 2014 IEP contained a list of specific strategies to be implemented related to executive functioning, including teacher "push-ins" to ensure B.A. understood directions and assignments, as well as a "Modification and SDI" "to address inattention," which specified that "teachers should monitor attention and prompt to complete the task."  (P-20 at 18-20).  Pursuant to the May 2014 IEP, in each of fifth and sixth grade, B.A. would receive 45 minutes per day, 5 days per week in each of reading and written expression.  He would participate with students without disabilities in the general education curriculum for spelling, math, science, and social studies.  Additionally,

pursuant to both the March 2014 IEP and May 2014 IEP, B.A. would spend 69% of his day in regular education classes.

As Parents point out, one minor change between the March 2014 and May 2014 IEPs was that, pursuant to the March 2014 IEP, B.A. would receive executive functioning instruction 40 minutes per day, 4 times per 6 day cycle (whereas pursuant to the March 2014 IEP, he would receive that instruction 30 minutes per day, 5 days per week). This amounted to somewhere between 2 hour and 2 hours, 40 minutes of instruction per week. This change amounted to a *de minimus* reduction in time devoted to executive functioning instruction for B.A., and did not amount to the denial of a FAPE. This is particularly true given, as Mr. Lefko testified, B.A.'s small class instruction was "predominately" focused on reading comprehension, but sometimes included working on other skills related to executive functioning. (9/2 Tr. at 554).

For the reasons stated above, and *supra*, II, we find that the Hearing Officer correctly found that the May 2014 IEP was sufficient on its face and as implemented, to provide B.A. with a FAPE.

### b. Least Restrictive Environment

Parents' argument that B.A. was not sufficiently "mainstreamed" at the District is inconsistent—and therefore even less persuasive—in the context of tuition reimbursement for the 2014-2015 and 2015-2016 school years. "The "IDEA requires that disabled students be educated in the least restrictive *appropriate* educational environment." Ridgewood, 172 F.3d at 249 (emphasis added). "If the educational environment is not appropriate, then there is no need to consider whether it is the least restrictive." S.H., 336 F.3d at 265. Applied here, Parents cannot simultaneously argue that the District environment is not appropriate and that it is not the LRE,

since the LRE analysis is only applicable in the event that the student's environment is deemed appropriate.

Additionally, Parents' argument with respect to mainstreaming is undermined by the fact that Parents chose to place B.A. at Hill Top, a disabled-only school. While Parents cite Rose v. Chester Cty. Intermediate Unit, No. CIV. A. 95-239, 1996 WL 238699, at *9 (E.D. Pa. May 7, 1996), for the proposition that the mainstreaming "requirement does not make sense in the context of parental placement," that court said only that the mainstreaming requirement does not *apply* to parents. Parents' argument that B.A.—who would spend 69% of his day in regular education classes—was denied a FAPE because he was not adequately mainstreamed is nonetheless undermined by the fact that Parents subsequently placed B.A. at Hill Top, where any amount of mainstreaming was not even an option. (Parent Opp'n at 15 n.9).

As the Hearing Officer correctly concluded, the District believed that B.A. would benefit from being primarily in regular education classes, and appropriately balanced that against his need for more personalized attention in certain subjects. This is also reflected by the fact that the time that B.A. spent out of the regular education classroom slowly, and minimally, decreased over time, as his specific needs in the areas of executive functioning, organization and social skills became more pronounced (and different in kind from the normal supports in these areas needed by fourth and fifth graders). (See HO Rpt. at 20-21; 9/2 Tr. at 491)

Additionally, while the Schmidt Report, like the District, recognized that B.A. would benefit from small classes with low student-to-teacher ratios, the Schmidt Report did not recommend the specific accommodations for which Parents advocated, i.e., small classes in a strictly regular education environment. Indeed, Parents admit that their decision to send B.A. to Hill Top was explicitly based on the Schmidt Report, and Hill Top has only special education

students.  (P-23; 8/21 Tr. at 289).  Moreover, Dr. Schmidt admits that she never observed B.A. at the District, so could not opine on whether the District had struck the right balance between placing B.A. in larger, regular education classes and smaller, learning support classes.  (8/21 Tr. at 300-302).

Accordingly, for the reasons stated above, the Court agrees with the Hearing Officer that the May 2014 IEP, if implemented, would have provided B.A. with a FAPE.  While Parents were entitled to reject the May 2014 IEP, they are not entitled to tuition compensation for that decision because the first prong of the Burlington-Carter test is not satisfied.  The Court need not reach at this time whether Hill Top was an appropriate environment for B.A., or which party the balance of equities favors.  (HO Rpt. at 24).

### iii. Did the Hearing Officer err as a matter of law in denying Parents' request for reimbursement for the Independent Educational Evaluation by Dr. Schmidt?

In their Complaint, Parents state that they are entitled to reimbursement for the Independent Educational Evaluation ("IEE") conducted by Dr. Kara Schmidt, though make no substantive argument in support of the request.  (ECF 1 at 36).  The District, however, argues that Parents are not entitled the compensation for the IEE because (1) they never asked the District to pay for it (7/28 Tr. at 252); (2) Parents did not collaborate with the District as to who would conduct the IEE, and it was "more likely sought in an effort to support Parents' position that [B.A.] should be placed at Hill Top"; (3) Parents never expressed disagreement with the 2012 Reevaluation Report[5]; and (4) the 2012 Reevaluation Report was "more than sufficient." (District Mot. at 32-33).

---

[5]     The Third Circuit has rejected this argument, and applies the tuition reimbursement regulation broadly to permit reimbursement not only when plaintiffs expressly disagree with an evaluation but also when "the parents[ ] fail[ ] to express disagreement with the District's evaluations prior to obtaining their own" evaluation, because unless the regulation is so applied "the regulation [would be] pointless because

An IEE is "an evaluation conducted by a qualified examiner who is not employed by the public agency responsible for the education of the child in question."  34 C.F.R. § 300.502(a)(3)(i).  If a parent disagrees with the reevaluation by the public agency, the parent has a right to an IEE, and unless the public agency files a due process complaint and establishes its evaluation was appropriate, the public agency must pay for the IEE.  Id. at § 300.502(b).  If it is determined an "agency's evaluation is appropriate," through a due process complaint, however, as here, a parent "still has the right to an IEE, but not at public expense."  34 C.F.R. § 300.502(b)(3).

The Hearing officer denied Parents' request for reimbursement for the Schmidt Report, on the basis that it:

> did not present information that was entirely new for an understanding of [B.A.'s] needs or potential programming in school.  While it may [] deepen understanding of [B.A.'s] needs, or help to flesh out further details related to programming, [the Schmidt Report] did not place the parties in a position where the trajectory of understanding [B.A.'s] needs was changed; and the programming in the November 2014 IEP, largely the same as in the appropriate May 2014 IEP, bears this out."

(HO Rpt. at 27).  The Court agrees with the District and Hearing Officer.

The Court further finds that Parents are not entitled to reimbursement for the IEE because they sought Dr. Schmidt's evaluation outside the collaborative process, and only sought reimbursement after unilaterally contacting Dr. Schmidt.  This was presumably because it was intended to provide "additional evidence that [the District's] proposed services were inadequate, thereby supporting [Parents'] contention that private placement at public expense was

---

the object of parents' obtaining their own evaluation is to determine whether grounds exist to challenge the District's."  Warren G. ex rel. Tom G. v. Cumberland Cnty. Sch. Dist., 190 F.3d 80, 87 (3d Cir. 1999).  Consequently, the Third Circuit has held reimbursement may be warranted where a parent does not take a position with respect to the district's evaluation or otherwise "fails to express disagreement."  Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 274-75 (3d Cir. 2007).

necessary." <u>L.M.</u>, 2015 WL 1725091, at *25 (holding parents not entitled to reimbursement where the "record demonstrates the evaluation was not obtained by plaintiffs in consultation with the District or with the intention [the student] would consider defendant's proposed placement."). Parents are not entitled to reimbursement for an IEE obtained under these circumstances.

### iv. Claims under Section 504 of the Rehabilitation Act

Plaintiffs argue the District violated Section 504 of the Rehabilitation Act by denying B.A. a FAPE. The District asserts Plaintiffs failed to provide any evidence of discrimination against B.A. so as to create liability under Section 504.

IDEA and Section 504 are similar causes of action. While IDEA imposes an affirmative duty on public schools that accept certain federal funds, Section 504 is a prohibition against disability discrimination in federally funded programs. <u>See</u> 29 U.S.C. § 794(a) ("No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."). A FAPE violation is not a *per se* violation of Section 504; a plaintiff must still prove all elements of a Section 504 case. <u>Andrew M. v. Del. County Office of Mental Health and Mental Retardation</u>, 490 F.3d 337, 350 (3d Cir. 2007). When a district court finds a child was provided with appropriate IDEA services, however, the court need not reach the Section 504 claim. <u>See</u> <u>Christen G. v. Lower Merion Sch. Dist.</u>, 919 F. Supp. 793, 821 (E.D. Pa.1996).

As the Hearing Officer concluded, Parents adduced no evidence of discrimination on the basis of disability, and did not argue that the evidence established a separate and distinct claim under § 504 in addition to the District's alleged denial of FAPE. "When parents assert identical claims under IDEA and Section 504, the findings in favor of a district or the remedies assessed

against a district are satisfied under the IDEA . . . To the extent that Parents intended to pursue a § 504 claim, it is deemed abandoned or waived based upon lack of evidence/argument." <u>L.M.</u>, 2015 WL 1725091, at *26.  Here, because B.A. was provided with a FAPE under the IDEA, and because Parents have provided no evidence of B.A. being subjected to discrimination, Parents have provided no basis on which this court could find a Section 504 violation.  As such, we dismiss the claim.

### v.   Claims under the Americans with Disabilities Act

Parents also request relief under the ADA (ECF 1 at 1), but fail to develop an argument in support of this claim.  Failure to develop said argument is a sufficient ground for deeming such claims waived.  <u>See</u> <u>Laborers' Int'l Union v. Foster Wheeler Corp.</u>, 26 F.3d 375, 398 (3d Cir. 1994) ("An issue is waived unless a party raises it in its opening brief, and for those purposes a passing reference to an issue . . . will not suffice to bring that issue before this court").

### vi.   Attorneys' Fees and Costs

A court may award attorney's fees to a "prevailing party" who brought suit under IDEA. 20 U.S.C. § 1415(i)(3)(B)(i)(I).  Because Parents did not "prevail" in this challenge, we decline to award attorneys' fees.  <u>See</u>, <u>e.g.</u>, <u>Hannah L. v. Downingtown Area Sch. Dist.</u>, 2014 WL 3709980, at *8 (E.D. Pa. July 25, 2014).

## VI.   Conclusion

For the reasons explained above, Parents' Motion for Judgment on the Administrative Record is denied, and the District's Motion for Judgment on the Administrative Record is granted.